58 July 21, 2016 No. 50

IN THE SUPREME COURT OF THE
STATE OF OREGON

Patricia PIAZZA,
acting on behalf of Farley Piazza and Associates
and as Personal Representative of the
Estate of Martha Paz De Noboa Delgado, deceased,
*Respondent on Review,*

*v.*

Bryan KELLIM,
dba 99 Pawn & Guns,
*Defendant,*

*and*

FIVE STARS, INC.,
dba The Zone;
Concept Real Estate, LLC; and
Concept Entertainment Group, Ltd.,
*Defendants-Respondents,*

*and*

ROTARY INTERNATIONAL
and Rotary International District 5100,
*Defendants-Respondents,*
*Petitioner on Review.*

S063442 (Control)

Patricia PIAZZA,
acting on behalf of Farley Piazza and Associates
and as Personal Representative of the
Estate of Martha Paz De Noboa Delgado, deceased,
*Respondent on Review,*

*v.*

Bryan KELLIM,
dba 99 Pawn & Guns,
*Defendant,*

*and*

FIVE STARS, INC.,
dba The Zone;
Concept Real Estate, LLC;

and Concept Entertainment Group, Ltd.,
*Defendants-Respondents,*
*Petitioners on Review,*

*and*

ROTARY INTERNATIONAL
and Rotary International District 5100,
*Defendants-Respondents.*

S063451

(CC 1201-00270; CA A153286;
SC S063442 (Control), SC S063451)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 7, 2016, at Lewis & Clark Law School, Portland, Oregon.

Jonathan Henderson, Davis Rothwell Earle & Xóchihua, P.C., Portland, argued the cause and filed the brief for petitioners on review Rotary International and Rotary International District 5100. With him on the brief were William Davis and Christopher M. Parker.

James L. Hiller, Hitt Hiller Monfils Williams LLP, Portland, argued the cause and filed the brief for petitioners on review Five Stars, Inc., dba The Zone; Concept Real Estate, LLC, and Concept Entertainment Group, Ltd.

J. Randolph Pickett, Pickett Dummigan LLP, Portland, argued the cause and filed the brief for respondent on review. With him on the brief were R. Brendan Dummigan, Kristen West McCall, Kimberly O. Weingart, Ron K. Cheng, and Benjamin B. Grandy, Law Office of Benjamin B. Grandy, P.C., Beaverton.

Kathryn H. Clarke, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

_____

* Appeal from Multnomah County Circuit Court, Edward J. Jones, Judge. 271 Or App 490, 354 P3d 698 (2015).

BREWER, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Balmer, C. J., dissented and filed an opinion, in which Landau, J., joined.

**BREWER, J.**

In this negligence action, plaintiff, the personal representative of the estate of Martha Delgado, alleged in her complaint[1] that Delgado—a foreign exchange student staying in this country under the supervision of defendants Rotary International and Rotary International District 5100 (the Rotary defendants)—was shot and killed by an assailant while standing in line on a public sidewalk outside the Zone, a teenage nightclub in Portland owned by several business entities (the Zone defendants).[2]

On defendants' motion, the trial court dismissed plaintiff's complaint on the ground that plaintiff had failed to state facts sufficient to constitute a claim for relief with respect to the issue whether Delgado's death was a foreseeable result of defendants' conduct. *See* ORCP 21 A(8) (providing for dismissal for "failure to state ultimate facts sufficient to constitute a claim"). A divided panel of the Court of Appeals reversed the ensuing judgment dismissing this action. *Piazza v. Kellim*, 271 Or App 490, 354 P3d 698 (2015). On review, we conclude that plaintiff alleged facts that—if proved—were sufficient to permit a reasonable juror to find that Delgado's death was a reasonably foreseeable result of defendants' conduct. Accordingly, we affirm the decision of the Court of Appeals, and we reverse the judgment dismissing this action and remand to the trial court.

## I.   FACTS AND PROCEDURAL HISTORY

A.   *The Complaint*

Because this is an appeal from a trial court judgment dismissing a complaint under ORCP 21 A(8), we assume that all well-pleaded facts are true and give plaintiff the benefit of all favorable inferences that reasonably may be drawn from those factual allegations. *See, e.g.*, *Caba v. Barker*, 341 Or 534, 536, 145 P3d 174 (2006) (stating standard of review). Plaintiff alleged that Delgado, age 17, was staying with a host family in White Salmon, Washington, as

_____

[1] Plaintiff's operative pleading was a second amended complaint; for ease of reference, we refer to that pleading as the complaint.

[2] The Zone defendants are Five Stars, Inc., Concept Real Estate, LLC, and Concept Entertainment Group, Ltd.

part of an international exchange program sponsored and managed by the Rotary defendants. On January 24, 2009, a group of approximately 14 Rotary exchange students, including Delgado, gathered at the home of the host parents of one of the students for a birthday celebration. Later in the evening, the host parents drove the group to the Zone. The Zone was an underage nightclub that admitted people ages 16 to 21 and featured dancing. The Zone was located in the "Old Town/Chinatown neighborhood" bordering downtown Portland; it also was part of what is referred to by police as the "downtown entertainment district," which consists of several streets where nightclubs and bars are located. The Zone frequently had a "cordoned-off line of customers on the sidewalk outside the club waiting to get in." The host parents dropped the students off near the Zone without a chaperone and planned to pick them up at 1:00 a.m.

Delgado and the other exchange students were waiting on the sidewalk to get into the Zone when an assailant, Ayala, shot Delgado twice. Delgado died as a result of her injuries. Ayala, who previously had been diagnosed with schizophrenia and had exhibited obvious signs of mental illness and depression to coworkers, "went to the Zone nightclub looking to shoot 'preppies' or 'pop tweens,' against who[m] he may have held a grudge." Before shooting Delgado, Ayala had stood in front of the Zone and loaded his pistol.

Delgado's shooting was not the first at that particular location. In July 2002, a shooter fired into a crowd of people standing outside the nightclub, striking three people. At that time, the club had a different name, but it was owned and operated by the Zone defendants. There also had been a "history of fights and assaults in the line outside the nightclub." In addition, the area surrounding the Zone had experienced violent crimes before the 2009 shooting. In the years preceding the 2009 shooting, the downtown entertainment district was "plagued by recurrent incidents of violence," which were "linked by police to gang activity and to clubs in the district exceeding capacity and serving too much alcohol." In 2005, a series of shootings left two people dead and four injured. "It was known by Portland police and club owners alike that there was a high probability that more

shootings would take place in the downtown entertainment district." As a consequence, police "blanketed the downtown entertainment district with police officers to ease fear." The effort, which was called "Operation Safe Streets," included at least two dozen police officers patrolling on foot and horseback on Friday and Saturday nights through early morning, and gang enforcement officers, traffic safety officers, parole officers, and liquor control investigators were also on patrol. Owners of area nightclubs were asked to close early on weekend nights and were advised to have adequate security, cut off all intoxicated customers, and respond swiftly to problems or notify police.

After violence continued in the downtown entertainment district, in August 2006, Portland police called a "bar summit" with owners and managers of downtown bars and nightclubs to help them adopt policies to reduce violence. At the meeting, which included a representative of one of the Zone defendants, businesses and police addressed, among other issues, the shootings in the Old Town/Chinatown neighborhood. At the summit, police and businesses also addressed whether the violence on downtown sidewalks and in parking lots was related to intoxicated club-goers (as police believed) or drug dealers (as clubs contended).[3]

By January 2009, the Old Town/Chinatown neighborhood "had approximately fourteen agencies serving addicted, mentally ill, and homeless people, more than any other neighborhood in the city, with thousands of clients coming to the area every day. Many of those clients bought drugs." "Drug dealers, drug users and gang members, all of whom frequented the area where the Zone nightclub was located, frequently carried weapons * * *." "[S]ome club owners, realizing that their clients were in danger of violent assault, increased security at their bars and nightclubs." In 2006, a principal of one of the Zone defendants "acknowledged downtown safety problems, but said they were created

---

[3] The Zone was located in what used to be one of Portland's "Drug Free Zones," in which anyone convicted of a drug offense could be barred from returning. The drug-free-zone program expired in 2007, and "drug dealers and addicts took over Portland's Chinatown/Old Town neighborhood," which police officers came to refer to as "crack alley." "Residents complained of being terrorized by an increasingly aggressive and confrontational breed of drug users and sellers."

by 'a few bad apples,' and that police, liquor control, and others should "work together for the benefit of club-goers."

Before the shooting, the Zone had undertaken some measures to provide security for customers inside and outside the club. Those measures included:

"(a)   The Zone had an employee whose primary responsibility was monitoring customers as they come and go from the club. The employee was to assist in line control; to distance 'undesirables,' i.e. intoxicated persons, harassers, transients, known trouble makers, or gang affiliated persons from guests; and to monitor the parking lot and deter potential guests from loitering in or around their cars;

"(b)   The Zone nightclub had a security camera that monitored the outside of their establishment;

"(c)   The Zone nightclub had a security guard or doorperson at the door outside of the premises who frisked everyone before entry, checking for drugs, alcohol, firearms, or other weapons;

"(d)   In the past, the Zone had hired off-duty police officers to provide security for their customers; [and]

"(e)   On or about 2006, [t]he Zone nightclub remodeled its facilities in the hopes of attracting a better clientele and reducing problems at the club including violence."

Thus, plaintiff alleged, the Zone defendants "knew about the risk of violence that its customers faced."

Plaintiff further alleged that underage nightclubs generally are understood to pose "inherent" risks of violence because of the high proportion of young male patrons, high noise levels, crowding, competitive environment, and underage drinking. "A metropolitan nightclub may see as many as three or four assaults on staff each night and are often confronted with armed patrons. Shootings, stabbings, felonious assaults, drug violations, and/or murders are commonplace in metropolitan nightclubs across the country." In fact, several cities around the country "have banned or heavily regulated teen dance clubs." According to plaintiff's allegations, the instances of violence that "occurred nationally at underage nightclubs and locally in the area around the Zone nightclub were all publicized in local and/or national

media, and [the Rotary defendants] knew, or in the exercise of reasonable care, should have known, about the dangers of leaving [Delgado] at the Zone nightclub on the date and at the time in question."

Plaintiff alleged that the Zone defendants owed a duty to Delgado, who was their business invitee, to exercise reasonable care to make the premises safe for her, including protection from criminal acts by third parties. Plaintiff further alleged that the Zone defendants breached that duty:

"(a)   In failing to take reasonable measures to protect their customers from the criminal acts of third parties;

"(b)   In making their customers stand in line in front of the club;

"(c)   In failing to have sufficient security personnel to protect their customers;

"(d)   In failing to properly train their staff to identify threats to their customers;

"(e)   In failing to identify *** Ayala as a threat while he was in front of [t]he Zone;

"(f)   In failing to have adequate emergency response procedures in place to protect customers once a threat was identified; [and]

"(g)   In failing to warn their customers or the parents of their customers about the risk of being assaulted while patronizing [t]he Zone nightclub."

With regard to the Rotary defendants, plaintiff alleged that Delgado lived with a host family under the "auspices, sponsorship, and control" of the Rotary defendants and that the host parents were the Rotary defendants' agents. Plaintiff alleged that the Rotary defendants were authorized to exercise "independent supervisory and parental responsibility to safeguard [Delgado's] physical and mental well-being," and, thus, that a special relationship between Delgado and the Rotary defendants "gave rise to a heightened duty of care beyond the general duty to avoid foreseeable risk of harm." According to plaintiff, the Rotary defendants, directly or acting through their agents, breached that duty:

"(a)   In failing to provide host parents with sufficient training so as to reasonably ensure the safety of the students;

"(b)   In leaving the students unsupervised, late at night in a high crime area;

"(c)   In failing to adopt and enforce reasonable rules and regulations to ensure the safety of the students;

"(d)   In failing to adopt reasonable rules and regulations regarding travel to prevent the students from being left alone in dangerous areas; [and]

"(e)   In failing to properly and adequately warn all the students and their parents of the dangers of being left unsupervised in a high crime area."[4]

B.   *The Motions to Dismiss*

The Zone defendants and Rotary defendants each moved under ORCP 21 A(8) to dismiss plaintiff's claims against them on the ground that plaintiff had failed to allege a foreseeable risk of harm to Delgado. Defendants argued that plaintiff's negligence claims reduced to the following theory: (1) criminals were more likely to commit crimes in the area in which the Zone was located; (2) defendants knew or should have known of that fact; and (3) Delgado was killed in that "high crime area." Those allegations, defendants argued, failed to establish a foreseeable risk of the particular crime that killed Delgado, which defendants characterized as a "random spree shooting" against a particular class of person ("preppies"). According to defendants, such a shooting was just as likely to occur at a mall, a movie theater, or an ice cream parlor; thus, "the occurrence of a random spree shooting in a high crime area does not make it any more foreseeable than if it occurred in a place one would normally deem safe, such as a movie theater or a school." Indeed, the "randomness" of shootings like the one that killed Delgado, defendants argued, "means that when and

---

[4] The Rotary defendants ask this court to take judicial notice, pursuant to OEC 201, of certain facts relating to the shooting incident in this case that are not alleged in plaintiff's complaint. In light of the procedural posture of our review of the judgment dismissing this action based on a motion to dismiss under ORCP 21 A(8), we decline that request, which was made for the first time before this court.

where they occur are not foreseeable, as that term is used in Oregon tort law."

Plaintiff, meanwhile, argued that defendants' arguments misapprehended what it means for a risk of harm to be reasonably foreseeable under Oregon case law. In plaintiff's view, "[f]oreseeability in this case does not turn on being able to foresee 'random spree shootings,' but rather on foreseeing the risk of a violent criminal assault" to Delgado. "[T]he dangerous character of the nightclub, its location and its violent history," plaintiff asserted, "would allow a jury to conclude that the harm in this case was foreseeable." She explained that "[t]here are many foreseeable ways in which the assault might have taken place[.] *** Even if an assault by a mentally ill person is somehow unusual or unexpected, the resulting harm was legally foreseeable because it was within the class of reasonably foreseeable hazards" at the Zone.

The trial court ultimately agreed with defendants, ruling that the shooting that killed Delgado was unforeseeable as a matter of law. The court subsequently entered limited judgments that dismissed all claims against both the Zone defendants and the Rotary defendants. Plaintiff appealed those limited judgments and argued before the Court of Appeals, as she did before the trial court, that her complaint alleged facts that, if proved, were sufficient to establish a reasonably foreseeable risk of the type of harm that befell Delgado.

C.  *The Court of Appeals Decision*

As noted, the Court of Appeals reversed. As to the Zone defendants, relying on several of this court's previous decisions, the Court of Appeals concluded that plaintiff had alleged sufficient facts that, if proved, would permit a trier of fact to find that (1) it was reasonably foreseeable to the Zone defendants that people standing in line outside the Zone late at night were at risk of harm from violent assault; and (2) Delgado's death was within that general class of harm. *Piazza*, 271 Or App at 509, 510-11. The court further concluded that the circumstances alleged in the complaint were not "so highly unusual, or the sequence of events so attenuated, that

no reasonable person in the Zone defendants' position could have anticipated the harm to Delgado." *Id.* at 512. Indeed, the court opined, "[a] jury could find, based on the facts alleged in the complaint, that the link between Ayala's crime, the Zone defendants' conduct, and Delgado's death was relatively straightforward"; defendants exposed Delgado to a risk of harm from violent assault when they left her to line up and wait on the street in a high-crime area, where a criminal could approach the line and shoot at the Zone's business invitees. *Id.* Therefore, the Court of Appeals reasoned, plaintiff had satisfied her pleading burden with respect to the issue of foreseeability as to the Zone defendants.

For similar reasons, as to the Rotary defendants, the Court of Appeals concluded that the complaint sufficiently alleged foreseeability of the risk of harm in at least one of plaintiff's specifications of negligence—leaving the students in a high-crime area—to withstand a motion to dismiss plaintiff's claim under ORCP 21 A(8).[5] *Piazza*, 271 Or App at 513-14. Plaintiff alleged that prior crimes in and around the Zone were "publicized in local and/or national media, and [the Rotary defendants] knew, or in the exercise of reasonable care, should have known, about the dangers of leaving [plaintiff] at [the Zone] on the date and at the time in question." *Id.* The court concluded, from those facts, that a reasonable juror could find that the host parents' conduct had exposed Delgado to a reasonably foreseeable risk of violent assault and that the type of harm that actually befell her was within that general class. *Id.* at 514.

Judge Edmonds dissented. As he saw the case,

"the very tragic specific harm that befell plaintiff's decedent was the result of a random shooter who was mentally ill and who undertook to shoot 'preppies.' The randomness of his criminal target demonstrates that it could have just as well have been committed at a soccer or football game, an outside youth church or synagogue gathering, a mall, a public or private school event, or any place where young people typically gather. Giving plaintiff the benefit of all reasonable inferences, it was a mere happenstance that

---

[5] The parties do not discuss plaintiff's remaining specifications of negligence as to the Rotary defendants. Accordingly, we do not consider them further.

the shooter chose the line of young people outside the Zone defendant's club as his target. For purposes of reasonable foreseeability, a specific risk of harm is only within the scope of a general risk of harm if the specific risk of harm resulting in the injury is qualitatively similar to other foreseeable specific risks of harm that fall within a general risk of harm. That test is not satisfied by plaintiff's allegations. The circumstances of the random shooting spree in this case are unrelated to plaintiff's 'high crime area' allegations. For these reasons, the specific risk of harm from a random shooting spree like the one in this case is not within the general risk of harm alleged by plaintiff."

*Piazza*, 271 Or App at 522-23 (Edmonds, S. J., dissenting).

Echoing Judge Edmonds' dissent, all defendants assert on review that the type of crime that occurred—which they describe as a "random spree shooting"—was unforeseeable as a matter of law. They argue that the Court of Appeals majority erred by describing the scope of the risk of harm too generally and by relying on the occurrence of prior crimes that were dissimilar to the circumstances of the crime at issue. In short, they assert that the Court of Appeals expanded the concept of general risk of harm beyond the practical realities of what business operators, parents, and adult supervisors should reasonably anticipate as risks of harm. Defendants also assert that courts in other jurisdictions have limited liability in circumstances such as those present here.

Plaintiff responds that this court's prior decisions have held that a plaintiff need not allege and prove the predictability of the actual sequence of events that caused the harm in question, but rather, must plead and prove facts showing a generalized risk of the types of incidents and injuries that occurred. Plaintiff urges that, under that framework—where all reasonably foreseeable risks of harm are relevant, not merely the particular harm that actually befell Delgado—plaintiff's factual allegations were sufficient to state a claim with respect to foreseeability.

## II.  ANALYSIS

The concept of foreseeability embodies a prospective judgment about a course of events; it "therefore ordinarily

depends on the facts of a concrete situation" and, if disputed, is a jury question. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 4, 734 P2d 1326 (1987).[6] Foreseeability plays a role in at least two overlapping common-law negligence determinations: (1) whether the defendant's conduct unreasonably created a foreseeable risk of harm to a protected interest of the plaintiff such that the defendant may be held liable for that conduct—formerly described in terms of "duty" and "breach" as measures of negligent conduct; and (2) whether, because the risk of harm was reasonably foreseeable, the defendant may be held liable to the plaintiff for the particular harm that befell the plaintiff—a concept that traditionally was referred to as "proximate" cause and which, in our current analytical framework, operates as a legal limit on the scope of a defendant's liability for negligent conduct. *See generally Fazzolari*, 303 Or at 11-18 (describing role of foreseeability in negligence determinations formerly described in terms of duty-breach and proximate cause); *see also* [Deckard v. Bunch](), 358 Or 754, 761, 370 P3d 478 (2016). In synthesis,

---

[6] Although often described as an "issue of fact," *id.*, it is more precise to describe the foreseeability determination as a blended factual and normative—that is, value-laden—inquiry that ordinarily is committed to juries. As one commentator has explained,

"[W]hen 'foreseeable' is used in what seems to be a kind of factual sense, as a prediction or anticipation, there is no implicit degree of likelihood in the reference. It may run from possible through likely and probable and even on up to certainty. *** When 'foreseeable' is used in the context of determining if a defendant acted unreasonably, not in the fashion of the reasonable person, then the degree of likelihood can be factored in among all the variables entering into the calculus of harm, thus giving it a pragmatic use. In this context 'foreseeable' is modified explicitly or implicitly by 'reasonably.'

"*****

"More subtle is the use of 'foreseeable' in a mode that is not purely factual or predictive. To say that something is or was foreseeable can trigger an interpretation that it is being used in the purely predictive mode because the verb 'to be' is so often used as if information is being provided, although often opinion or value judgments are involved. Comparison with a lay use of 'foreseeable' may be instructive. If a passenger in an automobile were to say to the driver, 'If you keep driving like this, it's foreseeable we'll have a wreck,' or just, 'You're risking our lives,' it is not likely he is only conveying information. It is a warning and a call for different behavior. Likewise, after the wreck, for someone to say, 'Well, it sure was foreseeable,' is to imply that it could have been prevented and likely that it should have been."

Walter Probert, *Torts and Language*, 48 Fla L Rev 841, 854-55 (1996) (footnotes omitted).

"unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff. The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party."

*Fazzolari*, 303 Or at 17.

Under that framework, in effect, the more traditional duty-breach and proximate cause analyses in a common-law negligence claim are subsumed in the question whether the defendant's conduct resulted in a reasonably foreseeable and unreasonable risk of harm to a protected interest of the kind that the plaintiff suffered. *Towe v. Sacagawea, Inc.*, 357 Or 74, 86, 346 P3d 1207 (2015).[7] But, as the passage quoted above from *Fazzolari* observes, the duty-breach analysis is not always subsumed in a foreseeability analysis. Rather, the nature and scope of the duty owed by the defendant to the plaintiff can be created, defined, or limited based on, among other things, the relationship between or status of

---

[7] Although uniform jury instructions are not sources of law, it often is useful to consider how sometimes elusive legal principles are understood and applied in practice by the trial judges and lawyers who are charged with following them. To that end, Oregon's Uniform Civil Jury Instructions describe the overlapping roles of foreseeability in the following way. Under UCJI 20.01, the jury is instructed to determine whether (1) "[t]he defendant's conduct was negligent"; (2) the defendant's negligence "was a cause of harm to the plaintiff"; and (3) "[t]he harm was reasonably foreseeable." UCJI 20.02 provides that a "person's conduct is negligent if that person fails to use reasonable care." That instruction further provides:

"In deciding whether a person used reasonable care, consider the dangers apparent or reasonably foreseeable when the events occurred."

A separate uniform jury instruction based on *Fazzolari*, UCJI 20.03, addresses the issue of foreseeability as a limit on liability:

"A person is liable only for the reasonably foreseeable consequences of his or her actions. There are two things that must be foreseeable. First, the plaintiff must be within the general class of persons that one reasonably would anticipate might be threatened by the defendant's conduct. Second, the harm suffered must be within the general class of harms that one reasonably would anticipate might result from the defendant's conduct."

the parties. *Towe*, 357 Or at 86. So understood, our thresh-
old inquiry is whether plaintiff has invoked a particular sta-
tus or relationship that affects our analysis.

 In her complaint, plaintiff invoked two special
relationships that informed defendants' obligations toward
Delgado, which defendants have not challenged at this point
in the litigation. The first, which plaintiff invoked as to the
Zone defendants, is the relationship between possessors of
land and persons whom they invite onto their premises. As
possessors of premises, the Zone defendants had an obliga-
tion to take reasonable steps to protect the nightclub's visi-
tors from reasonably foreseeable criminal acts by third per-
sons. *See, e.g.*, *Uihlein v. Albertson's, Inc.*, 282 Or 631, 639,
580 P2d 1014 (1978) (noting that this court previously had
adopted standard set out in *Restatement (Second) of Torts*
section 344 comment f (1965) "as being a part of the law of
this state").[8] The second special relationship, which plain-
tiff invoked with respect to the Rotary defendants, is the
relationship between a child and a person entrusted with
that child's care. For example, schools have a special duty to
students "apart from any general responsibility not unrea-
sonably to expose people to a foreseeable risk of harm," and
the "scope of th[at] obligation does not exclude precautions
against risks of crime or torts merely because a third person
inflicts the injury." *Fazzolari*, 303 Or at 19, 20.

 In both special relationships asserted by plaintiff,
the obligation to protect against risks of harm—includ-
ing the risk of harm from third-party criminal acts—is
broader than that which might apply in the absence of such

---

[8] *Restatement* section 344, comment f states:

 "Since the possessor is not an insurer of the visitor's safety, he is ordi-
narily under no duty to exercise any care until he knows or has reason to
know that the acts of the third person are occurring, or are about to occur.
He may, however, know or have reason to know, from past experience, that
there is a likelihood of conduct on the part of third persons in general which
is likely to endanger the safety of the visitor, even though he has no reason to
expect it on the part of any particular individual. If the place or character of
his business, or his past experience, is such that he should reasonably antic-
ipate careless or criminal conduct on the part of third persons, either gener-
ally or at some particular time, he may be under a duty to take precautions
against it, and to provide a reasonably sufficient number of servants to afford
a reasonable protection."

a relationship, but, because those relationships do not prescribe a particular scope of duty, that obligation does not extend to risks that are not reasonably foreseeable. *Id.* at 16-17, 20.[9] Thus, although each defendant is alleged to have had a special relationship with Delgado and a corresponding duty to take reasonable precautions to protect her against criminal conduct by third parties, those duties extended to only reasonably foreseeable criminal conduct. *See id*.

In this case, defendants do not dispute, based on the facts alleged in plaintiff's complaint, that they held the asserted special relationships toward Delgado, under which they had obligations to take reasonable precautions to protect Delgado against foreseeable risks of harm. Nor have defendants asserted that plaintiffs' allegations are insufficient, if proved, and if the risk of harm to Delgado otherwise was foreseeable, to establish that defendants failed to use reasonable care to protect Delgado from harm. Stated differently, apart from their general foreseeability challenge, defendants do not separately assert that plaintiffs' allegations were insufficient to establish, if proved, that their conduct was negligent.[10] Instead, as framed by defendants' motions, the only question before us is whether plaintiff's complaint alleged sufficient facts to withstand an ORCP 21 A(8) motion with respect to the issue of foreseeability as a legal limit on the scope of defendants' liability.

The question is whether plaintiff has alleged facts sufficient, if proved, to permit a jury determination that reasonable persons in defendants' positions would have

---

[9] Even when a special relationship is the basis for the duty of care owed by one person to another, this court has held that, if the special relationship (or status or standard of conduct) does not prescribe a particular scope of duty, then "[c]ommon law principles of reasonable care and foreseeability of harm are relevant." *Cain v. Rijken*, 300 Or 706, 717, 717 P2d 140 (1986) (quoted with approval in *Fazzolari*, 303 Or at 16-17); *see also* *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 342, 83 P3d 322 (2004).

[10] It follows that issues pertaining to whether defendants were negligent, such as "the feasibility and cost of avoiding the risk," which "bear on the reasonableness of defendant's conduct," are not before us. *See Donaca v. Curry Co.*, 303 Or 30, 38-39, 734 P2d 1339 (1987) (explaining difference between general foreseeability and duty/breach issues; whether county was negligent for failing to maintain right-of-way depended on whether county's action was reasonable in light of risk, including feasibility and cost of avoiding risk); *see also* *Hughes v. Wilson*, 345 Or 491, 502, 199 P3d 305 (2008) (applying principle).

foreseen a risk to Delgado's safety "of the kind of harm that befell" her. *See Fazzolari*, 303 Or at 17. "The community's judgment, usually given voice by a jury, determines whether the defendant's conduct met that threshold in the factual circumstances of any particular case." *Chapman v. Mayfield*, 358 Or 196, 206, 361 P3d 566 (2015). "The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it." *Fazzolari*, 303 Or at 18 (quoting *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 607, 469 P2d 783 (1970)).

In *Stewart*, this court elaborated on the nature of a court's role in the foreseeability determination. In that case, the plaintiff volunteered to assist in putting out a fire that the defendant had started at one plant and that then had spread to an adjacent warehouse. The plaintiff and others were hoisted to the roof of the warehouse by a forklift. In attempting to put out the fire, plaintiff fell through a covered skylight—covered by corrugated plastic and a film of dust so that it was indistinguishable from the rest of the roof—to the warehouse floor, suffering injuries. The question, the court said, was "whether plaintiff's injury and the manner of its occurrence was so highly unusual that we can say as a matter of law that a reasonable man *** would not have reasonably expected the injury to occur." *Stewart*, 255 Or at 609.

The answer required identification of a court's proper gate-keeping role:

> "The temptation here is to leave the question to the jury where the problem can be solved by an intuitive process, thus relieving us from the judicial task of reaching a reasoned conclusion. Unfortunately, however, we have inherited the duty to exercise control over the jury and to keep it within the bounds set for it, vague as they may be."

*Id.* at 607. On the facts presented, the court held:

> "A reasonable man could foresee that a fire started by him might spread to his neighbor's building and that in the effort to extinguish the fire his neighbor or a third person coming to his aid might be injured as a result of a variety of possible circumstances—by being burned, by falling off a ladder, by falling off a roof, by falling through a burned

portion of the roof, or by other similar risks normally asso-
ciated with fighting fires.

> "It is less likely that an injury would occur as a result
> of falling through a skylight and even less likely that one
> would fall through a skylight because it was covered in a
> manner that made it appear to be a solid part of the roof.
> But, although such conditions may not be a common cause
> of injury, on the other hand it cannot be said that this set-
> ting for possible injury is so uncommon that a jury could
> not reasonably describe as foreseeable the risk of harm
> which it creates."

*Id.* at 610. In short, the circumstances, although unusual,
were not "out of the range within which a jury could deter-
mine that the injury was reasonably foreseeable." *Id.* at
609-10.

In a later case involving third-party criminal con-
duct, this court recognized a limit on how generally the
type of harm at risk can be described. In *Buchler v. Oregon
Corrections Div.*, 316 Or 499, 853 P2d 798 (1993)—a case on
which defendants here heavily rely—this court considered
whether the state could be held liable in negligence for the
death and serious injury of victims of violence inflicted by an
escaped prisoner. The prisoner was a member of a work crew
in a remote location. The crew supervisor had left a state
van's keys in the ignition. The prisoner escaped in the van,
drove 50 miles to his mother's house, stole a gun, and, two
days after the escape, shot two people, killing one of them.
The trial court granted the state's summary judgment
motion, and, on review, the plaintiffs' claims raised several
issues concerning foreseeability relating to the plaintiffs'
various theories of negligence.

One foreseeability issue in *Buchler* concerned the
plaintiffs' claim that the state had facilitated the harm to
the victims by leaving the van's keys in the ignition. *Id.* at
507. The court explained that describing the type of harm
at risk too generally—such as stating that criminals com-
mit crimes or that escaped prisoners may commit crimes
while at large—makes criminal acts the legal responsibility
of everyone who may have contributed in some way to the
criminal opportunity. *Id.* at 511. Such a conception would

sweep too broadly because "mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it." *Id.* at 511-12. The court in *Buchler* ultimately concluded as a matter of law that the harm that the plaintiffs suffered was not a reasonably foreseeable consequence of the risk created by leaving the keys in the van. *Id.* at 514. In doing so, the court clarified that, for a jury question to arise with respect to foreseeability, the relevant risk of harm must be *reasonably* foreseeable. *Id.*

In keeping with its focus in *Stewart*, *Fazzolari*, and *Buchler*, this court recently has emphasized the centrality—in determining whether a triable issue has been established with respect to foreseeability—of the plaintiff's description of the injury-producing factual circumstances in the context of her theory of liability:

> "[A]s part of determining whether the defendant's conduct was unreasonable, there is nothing surprising about a conception of foreseeability that assesses the overall 'setting for possible injury' under the plaintiff's theory of liability. Drawing on the plaintiff's theory of liability, the court in *Stewart* determined that it was not unlikely that an 'injury would occur in this manner in the course of fighting a fire.'"

*Chapman*, 358 Or at 208 (citations omitted); *see also Fazzolari*, 303 Or at 22 (stating that, where school knew of assaults at specific locations on school property, trier of fact could find that school should have warned students of that general risk, which included risk of rape).

In *Chapman*, this court held, in reviewing a grant of summary judgment, that the trial court had properly dismissed the plaintiff's action against a tavern that allegedly had over-served a visibly intoxicated patron who, in turn, left the tavern on foot, walked down the street to another business establishment, and unintentionally fired a concealed handgun through the door, injuring two people inside. 358 Or at 198. To establish foreseeability, the plaintiff primarily relied on (1) expert opinion evidence that intoxicated persons frequently become violent and that medical, scientific, and lay journals have documented a connection between violence

and alcohol for decades; and (2) experiential observations by a bartender at another tavern in the vicinity about the link between alcohol and violence. *Id.* at 220. We concluded that the plaintiff's pleading and evidence did not create a triable issue of fact with respect to foreseeability. We explained:

> "[E]ven though the precise mechanism of harm need not be foreseeable, it is necessary to describe the type of harm at risk and the class of plaintiffs at risk with reference to the particular factual circumstances of the case, as gleaned from the pleadings and evidence in the record. Based on the circumstances of this case, we conclude that the appropriate characterization of the type of harm at issue is an unintentional attack by a visibly intoxicated patron after he had left defendant's premises. *Cf. Fazzolari*, 303 Or at 21-22 (characterizing type of harm from failing to provide adequate warning or security as an assault on students at school); *Stewart*, 255 Or at 610 (describing type of harm from negligently setting fire as injuries that may occur while attempting to extinguish fire). We further conclude that plaintiffs' evidence was insufficient because it described the risk of harm too generally.

> "As explained, evidence that it is common knowledge that intoxicated people have impaired judgment and may, therefore, behave improperly is too general to establish that a person who serves a visibly intoxicated person reasonably should expect that that person will commit an assault. Evidence making the bare assertion that it is common knowledge that visibly intoxicated persons frequently become violent is no more sufficient. Such evidence does not create a permissible inference that a particular defendant should have been aware of an unreasonable risk of violent harm or that a particular plaintiff was within the class of persons at risk of such harm."

*Chapman*, 358 Or at 220-21.

Other, more specific evidence—such as evidence showing the rate of incidence of violence among intoxicated drinkers, the types of intoxicated drinkers who become violent, or the class of persons at risk of violent harm from a visibly intoxicated person—could have been adduced in *Chapman* that may have permitted different inferences so as to preclude summary judgment. The omission of such evidence, we held, distinguished the circumstances in *Chapman*

from those in *Stewart*, where this court was willing, in the
absence of more direct evidence, to use general knowledge
to supply an inference that the risk of harm was reasonably
foreseeable. *Id.* at 221; *see Stewart*, 255 Or at 611 (although
record did not contain statistics on frequency of injuries
resulting from falling through concealed skylights, "general
knowledge" of manner in which injuries occur supported
foreseeability of how injury could occur in such manner). The
plaintiff's evidentiary proffer in *Chapman* did not include
facts that would support an inference—based on general
knowledge—that it was reasonably foreseeable to the defen-
dant that the visibly intoxicated patron would unintention-
ally attack the plaintiffs at a different location. *Chapman*,
358 Or at 222; *see Buchler*, 316 Or at 511 (disavowing broad
conception of foreseeability based on purported "common
knowledge" connecting thieves, guns, and crimes).[11]

      Before summing up the principles that govern our
analysis, we briefly turn to one of defendants' primary points
of emphasis. There is an understandable thirst in this area
of the law for bright-line rules that—at least in theory—can
produce predictable results from case to case in negligence
claims. In urging this court to require a high degree of sim-
ilarity between the nature and circumstances of prior crim-
inal acts and the criminal act at issue here, defendants note
that some courts have analyzed whether a particular crim-
inal act was reasonably foreseeable based on prior similar
acts, and others have looked to the place and character of
the location of the act. *See, e.g.*, *McKown v. Simon Property
Group, Inc.*, 182 Wash 2d 752, 768-74, 344 P3d 661, 667-70
(2015) (discussing the two approaches). Courts following the
"prior similar acts" approach have held that prior acts must
be sufficiently similar in character to the act at issue before
the latter can be deemed to have been foreseeable.[12]

--------

[11] This court has "cautioned against turning fact-specific decisions on fore-
seeability into rules of law." *Chapman*, 358 Or at 222 (quoting *Bailey v. Lewis
Farm, Inc.*, 343 Or 276, 289, 171 P3d 336 (2007) (citing *Fazzolari*, 303 Or at 16)).
In *Chapman*, we concluded:

    "We do not depart from that precept here; rather, our decision turns on the
    specific facts in the record before us."

*Id*.

[12] *See, e.g.*, *Romero v. Giant Stop-N-Go of New Mexico, Inc.*, 146 NM 520,
212 P3d 408 (2009) (holding that evidence of prior robberies, theft, physical

Under the "place and character" test, courts have tended to focus on whether the place and character of a location or business "invited" the criminal behavior. *See, e.g.*, *Early v. N.L.V. Casino Corp.*, 100 Nev 200, 204, 678 P2d 683, 685 (1984), *partially overruled on other grounds by Moody v. Manny's Auto Repair*, 110 Nev 320, 871 P2d 935 (1994). In response to a claim that an unprovoked attack at a large music festival was foreseeable based on incidents at previous festivals, and because crime is foreseeable when large groups of people gather, the New York Court of Appeals held that "[a] random criminal attack of this nature is not a predictable result of the gathering of a large group of people." *Maheshwari v. City of New York*, 2 NY3d 288, 294, 810 NE2d 894 (2004). In the same vein, the California courts have emphasized that "it is difficult if not impossible in today's society to predict when a criminal might strike," and "if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." *Wiener v. Southcoast Childcare Centers*, 32 Cal 4th 1138, 1147, 1150, 88 P3d 517, 524 (2004).

The concerns expressed in the cited cases are reasonable; in fact, they animated in part this court's rejection of the facilitation rationale that the plaintiff in *Buchler* presented. We also recognize the relevance of the factors that other courts have identified in the foreseeability analysis. In many sets of factual circumstances, multiple considerations—including the place and character of the location of a criminal act, and the occurrence of prior similar acts—are relevant. However, as we repeatedly have stated, our

---

altercations, domestic violence, harassment, narcotics and suspicious persons at same location did not make targeted and deliberate shooting of plaintiff's decedents foreseeable). Under that approach, courts also have held that the prior acts must have happened in the vicinity of the location where the act at issue occurred before that act can be deemed foreseeable. *See Sigmund v. Starwood Urban Inv.*, 475 F Supp 2d 36, 46 (D DC 2007), *aff'd*, 617 F3d 512 (DC Cir 2010) (looking at a five-block radius around area of the attack and concluding that sudden and unexpected attack was not foreseeable). In addition, courts using that formula have held that the prior acts must have happened relatively recently, *Dwiggins v. Morgan Jewelers*, 811 P2d 182, 183 (Utah 1991) (one robbery five years earlier insufficient to make subsequent robbery foreseeable), and with some degree of frequency. *See Dudas v. Glenwood Golf Club, Inc.*, 261 Va 133, 140, 540 SE2d 129 (2001) (two robberies within the month preceding the attack on plaintiff was not enough for foreseeability because there was no imminent danger).

preference for giving voice to the community's judgment through a jury determination prevails, except in extreme cases, where no reasonable person could find that the harm that befell the plaintiff was reasonably foreseeable. *Fazzolari*, 303 Or at 17-18; *Stewart*, 255 Or at 607. Under that framework, a narrow focus on the actual sequence of events that led to a particular injury to a particular person "misunderstands foreseeable risk." *Towe*, 357 Or at 106 n 17. A defendant need not have been able to precisely forecast a specific harm to a particular person to be held liable. *See id.* This court punctuated that point in *Fazzolari* when it made the following observations about *Stewart*:

"[T]he *Stewart* opinion acknowledged that '[w]hether the harm in a particular case is deemed foreseeable may depend upon the manner in which we describe 'harm.' This is even more true of 'risk.' *Stewart* itself made clear that the court meant generalized risk of the types of incidents and injuries that occurred rather than the predictability of the actual sequence of events. One reasonably might foresee that a fire might place others seeking to protect a neighboring building in danger of injury by falling as well as by being burned, even though one might not foresee that the fall would be through an insecurely covered and hidden skylight. So, at least, a jury might find."

*Fazzolari*, 303 Or at 13 (citations omitted).

Nor is it necessary that a particular quantifiable mass of similar types of incidents involving a narrow class of victims have occurred at a precise location for a triable issue of fact with respect to foreseeability to arise. In *Fazzolari*, for example, a jury question was created by generalized and somewhat limited evidence concerning the defendant school's prior experience with criminal activity:

"Here there was evidence that a woman reportedly had been sexually assaulted on the school grounds 15 days before the attack on plaintiff, and plaintiff attempted to introduce evidence of various other kinds of attacks. Obviously a school's responsibility for students' safety against assault is not limited to the risk of rape, and evidence of foreseeability will differ depending on whether the risk of injury is claimed to be specific to a school, or schools

generally, or a neighborhood, or a class of potential victims such as women or particular ethnic groups."

*Id.* at 21 (citation omitted).

But that does not mean that the foreseeability determination is untethered to principle. As our previous decisions show, negligence claims arising from third-party criminal acts often involve the defendant's failure to monitor or screen a dangerous third person or the placement of another person at unreasonable risk of criminal harm at a location and in circumstances that are unsafe. In either situation, there is a common requirement: a trier of fact must be able to find from concrete facts that a reasonable person in the position of the defendant reasonably would have foreseen that the person or location and circumstances posed a risk of criminal harm to persons such as the plaintiff. *See generally Towe*, 357 Or at 86; *Oregon Steel Mills*, 336 Or at 340; *Fazzolari*, 303 Or at 17. Facts pertaining to the similarity, frequency, and recency of prior criminal acts, committed under the same or similar circumstances, or at or near the same location, and involving the same or similar types of victims, as well as the place and character of the location of the current criminal act, are all relevant to the determination. *See Chapman* 358 Or at 220-22; *see also Buchler*, 316 Or at 511-12; *compare Uihlein*, 282 Or at 640-41 (store not liable for shopper assaulted in supermarket when little evidence of unsafe location), *with Brown v. J.C. Penney Co.*, 297 Or 695, 710, 688 P2d 811 (1984) (store liable for shopper attacked in parking lot where there was ample evidence of criminal activity in area). Defendants have not persuaded us that those principles require further refinement or that the circumstances of this case present a compelling reason to do so.

## III.   APPLICATION

As discussed, defendants repeatedly recount the details of this particular shooting, emphasizing the mental illness of the shooter, his grudge against teens, and characterizing the attack as a "random spree," and the shooting as "indiscriminate." Defendants then fault plaintiff's allegations of foreseeability because they involve different facts. To the extent that their challenge focuses on the precise

sequence of events that occurred in this case, defendants invite a taxing level of comparison that this court consistently has rejected. As noted, contrary to defendant's focus, foreseeability has reference to the "generalized risk of the types of incidents and injuries that occurred[,] rather than the predictability of the actual sequence of events." *Fazzolari*, 303 Or at 13 (discussing *Stewart*). Moreover, plaintiff's allegations support an inference that the attack in this case was not random in the sense of being indiscriminate or lacking a plan or purpose. The complaint alleged that the shooter specifically targeted the Zone because it was a teenage nightclub that attracted young people like Delgado. Although the shooter could have chosen other locations to carry out his plan, that fact does not make the shooting any less foreseeable to defendants.

We agree with defendants that, among the numerous facts alleged in plaintiff's complaint, some, viewed in isolation, would be too general to sustain her threshold pleading burden with respect to foreseeability. For example, the allegations that violent crimes have occurred in downtown Portland over a period of several decades, and in some instances, many blocks away from the Zone, and a recitation of general crime statistics for "these neighborhoods," alone add little to the analysis.[13] Defendants are right to observe that such generalized allegations—substantially separated in time and distance from the pertinent events

---

[13] For example, plaintiff listed the crime statistics of "these neighborhoods" in her opening brief before the Court of Appeals:

"From September 2006 through December 2006—1 homicide, 282 assaults, 3 rapes, 67 robberies, 15 sex crimes and 2 kidnappings;

"From January 2007 through December 2007—3 homicides, 16 rapes, 716 assaults, 187 robberies, 34 sex crimes and 7 kidnappings;

"From January 2008 through December 2008—13 rapes, 709 assaults, 145 robberies, 45 sex crimes, and 5 kidnappings;

"From January 4, 2009 through January 18, 2009 (the two weeks preceding the incident at issue here)—31 assaults, 7 robberies and 2 sex crimes."

Plaintiff does not, however, specify exactly what she means by "these neighborhoods," beyond the fact that she is referring to the Chinatown/Old Town and downtown neighborhoods. Plaintiff also fails to provide information regarding the proximity of those crimes to the Zone. The "neighborhood" in question spans 52 square blocks, and the "downtown entertainment district" comprises nine blocks.

here—closely resemble the sort of attenuated circumstances that this court eschewed in *Buchler*.

However, at the pleading stage of this case, the dispositive issue is whether the allegations of foreseeability in plaintiff's complaint can withstand a motion to dismiss. In making that determination, we conclude that the proper level of generality at which to compare the criminal history on which plaintiff relies and the shooting in this case is to treat both as falling within the category of violent assaults. This court's previous decisions generally prescribe a relatively broad level of generality in assessing the reasonable foreseeability of criminal conduct as a limit on liability. *See, e.g.*, *Fazzolari*, 303 Or at 21 (treating sexual assault and other types of assaults at a school as falling in same category for purposes of foreseeability). That is especially true where, as here, the risk of harm at a particular location is at issue. *See, e.g.*, *Uihlein*, 282 Or at 641 ("[T]here must be something to alert the storekeeper to the likelihood of harm of some kind from a criminal agency."). That only makes sense. When a business owner is on notice that—in the absence of reasonable precautions—assaultive conduct can be anticipated where people are waiting in line to enter its premises, it rings hollow to suggest that a specific crime pattern triggers the owner's duty to protect patrons only with regard to those specific crimes (such as gang-related homicide) that have occurred. Only if we can say that the types of historical crimes are so dissimilar, or so remote in time and location from the current crime that no reasonable person could determine that the current crime was foreseeable, will a court intervene to remove the matter from the jury as a matter of law. *Fazzolari*, 303 Or at 13, 17-18, 21.

Here, plaintiff alleged a repeated—if somewhat unevenly spaced—history of violent assaults, including gun violence, at and in the neighboring vicinity of the Zone, and a known risk of such violence in the future. In the years preceding the 2009 shooting, the downtown entertainment district—a nine block area that included the Zone—had been "plagued by recurrent incidents of violence," which were "linked by police to gang activity and to clubs in the district exceeding capacity and serving too much alcohol."

In 2005, a series of shootings in that district left two people dead and four injured. "It was known by Portland police and club owners alike that there was a high probability that more shootings would take place in the downtown entertainment district." Pertinent to the foreseeability of that risk are plaintiff's allegations asserting, in effect, that the Zone defendants knew that teenage nightclubs such as the Zone are especially susceptible to incidents of violent assault. Plaintiff alleged that the Zone defendants had in the past acknowledged the risks of harm posed by that history at the Zone and in the downtown entertainment district. Plaintiff also alleged that a gunman stood and loaded his gun on that sidewalk, a gunman who was attracted to that location because he could find young people standing where he found and shot Delgado.

Those allegations would permit a reasonable trier of fact to determine that a reasonable person in the position of the Zone defendants reasonably would have foreseen a risk of violent assault on the public sidewalk outside the nightclub, where underage patrons were queued up to enter. They also are sufficient to permit a reasonable trier of fact to find that the harm that befell Delgado was within the class of harms at risk.[14]

The foregoing allegations would not, by themselves, permit a finding that the risk of harm to Delgado was reasonably foreseeable to the Rotary defendants. However, plaintiff further alleged, with respect to those defendants, that the prior violent assaults in and around the Zone were "publicized in local and/or national media, and [the Rotary defendants] knew, or in the exercise of reasonable care, should have known, about the dangers of leaving [Delgado] at the Zone nightclub on the date and at the time in question." Assuming, as we must at this stage of the proceedings, the truth of those allegations, we cannot say that no trier of fact reasonably could determine that a reasonable person

---

[14] We deliberately do not assign a particular degree of significance or lack of significance in the foreseeability determination to many of the facts alleged in plaintiff's complaint, in terms of tipping the scales in favor of the overall sufficiency of plaintiff's pleading. By emphasizing the core facts summarized above, we simply note what, in our view, fundamentally surmounts the sufficiency hurdle.

in the position of the host parents would have foreseen a risk of violent assault on the public sidewalk where they left Delgado. The question whether plaintiff can adduce evidence sufficient to create a triable issue of fact with respect to those allegations, of course, is not presently before us.[15]

Moreover, on the facts alleged, we are unable to say that a reasonable trier of fact would have to find that the criminal harm that befell Delgado was categorically different from the criminal harms of which the Rotary defendants had notice, and that no reasonable factfinder could find that the harm to Delgado fell within the class of harms of which the Rotary defendants are alleged to have been aware. The link between defendants' allegedly negligent conduct and the actual harm that befell Delgado was direct: Plaintiff alleged that the Rotary defendants knew that there had been a significant history of violent assault late at night at or near the Zone, they took Delgado to the Zone and left her there, and she was the victim of a violent assault. That chain of events is not the sort of "concatenation of highly unusual circumstances" that compels the conclusion that Delgado's death was not reasonably foreseeable as a matter of law. *See Stewart*, 255 Or at 609.

## IV.   CONCLUSION

It bears repeating that, as framed by defendants' motions, the issue before us is not whether plaintiffs' allegations were sufficient, if proved, to show that defendants' conduct was unreasonable in light of a reasonably foreseeable risk of harm to Delgado. Thus, we are not concerned—for example—with whether any precautions that defendants took or failed to take were reasonable in relation to

---

[15] The Court of Appeals correctly understood that:

"Plaintiff's complaint does not rest on allegations that crime is generally foreseeable, or on a conclusory allegation that [t]he Zone is located in a high-crime area. Rather, plaintiff alleged specific facts that, if proved at trial, would establish that [t]he Zone nightclub had experienced violent crime, including homicidal violence. Assuming, as we must at this stage of the proceedings, the truth of those allegations, and that the host parents were aware of those facts and nevertheless left Delgado there, a reasonable juror could conclude that the host parents' conduct exposed her to a foreseeable risk of violent assault."

*Piazza*, 271 Or App at 514.

the nature or degree of foreseeable risk of harm to persons in Delgado's circumstances. Instead, our exclusive focus is on reasonable foreseeability as a legal limit on the scope of defendants' liability.

In *Fazzolari*, this court said:

> "Another person's crime was once thought to lie beyond a defendant's responsibility on grounds of 'proximate cause,' *Aune v. Oregon Trunk Railway*, 151 Or 622, 630-31, 51 P2d 663 (1935), but more recent decisions have dealt with the behavior of others, lawful or otherwise, as part of the general analysis of foreseeable risks."

303 Or at 20. The court's separation of foreseeability from causation arose from a concern that proximate cause not be invoked to improperly cut off claims by substituting a judicial veto for what ordinarily is a jury determination. As this court previously had stated:

> "[W]e cannot lose sight of the fact that we are simply making an allocation of the appropriate functions of the court and jury. The sole function of a rule of limitation in these cases is to tell the court that it must not let the case go to the jury. The jury should be given wide latitude in setting these limits of liability, whether it be done under a formula of negligence or causation."

*Dewey v. A.F. Klaveness & Co.*, 233 Or 515, 535, 379 P2d 560 (1963) (internal quotation marks and citation omitted).

In this case, plaintiff's allegations accomplished—at the pleading stage—what the evidentiary proffers in cases such as *Buchler* and *Chapman* did not. Plaintiff alleged concrete facts showing a history of violent assault at and in the vicinity of the Zone nightclub and related facts that, if proved, would support a determination that reasonable persons in defendants' positions would have foreseen a risk of violent assault against patrons lined up on the sidewalk outside the nightclub. *Cf. Buchler*, 316 Or at 511 (evidence of generic fact that criminals commit crimes insufficient to establish foreseeability).

Moreover, the type of harm that befell Delgado generally corresponded to the risk of violent assault to patrons of the Zone in Delgado's position that was reasonably

foreseeable to defendants. *Cf. Chapman*, 358 Or at 219-22 (evidence involving violence by or among visibly intoxicated patrons on premises at other bars did not support inference that it was reasonably foreseeable that defendant tavern's well-behaved but visibly intoxicated patron would leave tavern premises and unintentionally shoot victims at different location). As our prior decisions teach, it is the general nature of the harm at risk, not the precise nature of the harm suffered by a particular victim, that controls the analysis.[16] Plaintiff's allegations were sufficient to withstand defendants' motion to dismiss.

The dissent's disagreement with our conclusion requires some discussion but, in the end, it presents similar arguments to those of the dissent in the Court of Appeals.

The dissent's most insistent disagreement with our ultimate conclusion is grounded in our characterization of the risk of harm in this case as violent assault. The dissent would describe the relevant risk more narrowly as "gang-, drug-, and alcohol-related violence." 360 Or at __ (Balmer, C. J., dissenting). According to the dissent, the relevant risk in this case is defined in plaintiff's complaint "by the type of criminal," not "the type of crime." *Id.* at __. But, such narrow conceptions of the relevant risk are not supported by our previous decisions, including those on which the dissent relies.

It is true that, in determining the appropriate level of generality with which to characterize the risk of harm, we "[d]raw[] on the plaintiff's theory of liability" and "view[] the defendant's conduct through the lens of the particular factual circumstances of the case." *Chapman*, 358 Or at 208. However, as we also reiterated in *Chapman*, in the context of the pertinent factual setting, we "describe[e] the type of harm at risk more generally, rather than predicting an actual sequence of events." *Id.* at 208-09. The problem with the plaintiff's evidentiary proffer on summary judgment in

---

[16] Again, that is not to say that differences between past criminal acts committed at or near the Zone and the shooting in this case would not be relevant to the issue of foreseeability as it relates to whether defendants' conduct was unreasonable in light of the risk of harm to patrons such as Delgado. That, as previously noted, is a different matter.

*Chapman* was that it relied on "common knowledge" that intoxicated tavern patrons engage in violence, an assertion for which there was no factual support in the record and which did not square up with the plaintiff's pleaded theory that the patron in that case unintentionally shot the plaintiffs. *Id.* at 220-21. In short, there was a failure of proof that might have been remedied by the presentation of concrete evidence that applied to the circumstances of the case. *Id.* at 221. Although the dissent acknowledges, as it must, that in assessing foreseeability, "we focus on generalized risks of harm," 360 Or at __ (Balmer, C. J., dissenting), it never fully comes to grips with that standard in appraising the allegations of plaintiff's pleading: A "generalized" risk of harm inherently connotes an assessment at a relatively broad level of generality.

        The dissent also disagrees with our characterization of the relevant risk of harm at issue in *Fazzolari*. As the dissent sees it, *Fazzolari's* discussion of the foreseeability of different kinds of assaults, in particular, its statement that "a school's responsibility for students' safety against assault is not limited to the risk of rape," 303 Or at 21, must be understood as focused on "the reasonableness of the school's precautions," 360 Or at __ (Balmer, C. J., dissenting), rather than on foreseeabilty as a limit on a defendant's liability. We do not share the dissent's reading of *Fazzolari*. When the quoted statement from *Fazzolari* is read in context, it is apparent that the court was discussing foreseeability as it relates to the risk of harm. Before making that statement, the court discussed the "issue of foreseeability \*\*\* [and whether] no reasonable factfinder could find the attack on [the] plaintiff to have been a foreseeable risk." 303 Or at 21. The court then referred to the "generalized risks of the types of incidents and injuries" discussed in *Stewart*. *Fazzolari*, 303 Or at 21. Applying that concept to the facts of the case, the court noted the evidence of the sexual assault on school grounds 15 days before the attack on plaintiff and that the plaintiff had attempted to introduce evidence of various other kinds of attacks. *Id*. The court then stated:

> "Obviously a school's responsibility for students' safety against assault is not limited to the risk of rape, and evidence of foreseeability will differ depending on whether the

> risk of injury is claimed to be specific to a school, or schools generally, or a neighborhood, or a class of potential victims such as women or particular ethnic groups."

*Id*. Only after discussing the foreseeability of the risk of harm did the court refer, as an additional point, to foreseeability as a measure of the defendant's unreasonable conduct:

> "Also, the character and probability of the risk that is claimed to be foreseeable bears on the steps administrators reasonably should take to avert it."

*Id*. at 21-22. In any event, that reference does nothing to diminish the fact that, as the court held, the proper level of generality with which to view the risk of harm under the plaintiff's theory of liability in *Fazzolari* was the risk of assault in general, not a particular type of assault. *Id*.

And, that was no aberration. As early as *Danner v. Arnsberg et al*, 227 Or 420, 362 P2d 758 (1961), this court held that, if a plaintiff's injury was "of the same general character" as an injury that could be anticipated, the injury was not necessarily unforeseeable. *Id*. at 427-28. In *Stewart*, we noted that "liability is confined to harms * * * that are of the general kind to be anticipated from the [allegedly tortious] conduct." 255 Or at 608-09 (quoting Harper & James, *The Law of Torts* Introduction xl (1956) (emphasis and brackets added)). *Fazzolari* adopted the same standard. 303 Or at 21. In short, the question is whether, in the factual setting of the case, the harm suffered by the plaintiff is of the same general kind to be anticipated from the defendants' allegedly negligent conduct. Nothing that we have said since *Fazzolari* has altered that fundamental construct.

As that principle applies here, the fact that the history of violent assaults at and in the neighborhood surrounding the Zone included gang, alcohol, and drug-related conduct, and shootings, as well as other forms of physical violence, is not dispositive of the foreseeability inquiry.[17] The facts that

---

[17] We note that, rather than give plaintiff's pleading the benefit of all reasonable inferences in its foreseeability analysis, the dissent has failed to give appropriate weight to several relevant historical facts alleged in plaintiff's pleading, including the 2005 series of shootings in the Downtown Entertainment District, the "history of fights and assaults in the line outside" the Zone, and the more general allegation that "shooting, stabbings, felonious assaults, drug violations,

plaintiff alleged, if proved, would permit a determination
that the location at which Delgado was attacked—because
it attracted party-going young people at night—attracted
violent assault in various forms. As plaintiff alleged, the
shooter was drawn to that location precisely because he
expected to find partying teens at that location and time. To
call the attack random, senseless, or mass does not advance
the analysis very far. The shooting in this case was random
in the sense that the shooter could have picked other loca-
tions to find teen victims, but it was no more random than
attacks in the area that were the product of gang-related
violence, to the extent that gang violence involves members
of one gang targeting another gang at a location where that
gang might be found.[18] Reasonable minds can and do differ
as to whether, in light of the history of violent assaults at
the Zone and in the surrounding neighborhood, the attack
on Delgado was reasonably foreseeable.[19]

       In a different argument, the dissent asserts that,
in concluding that plaintiff has sufficiently stated a claim
with respect to foreseeability, we have mistakenly failed

---

and/or murders are commonplace" in underage nightclubs. *See* 360 Or at __
(Balmer, C. J., dissenting). Moreover, contrary to the dissent's apparent assump-
tion, *Id*. at __, and, giving, as we must, plaintiff's pleading the requisite benefit of
all reasonable inferences, there is no indication that all those incidents involved
drug, alcohol, and/or gang-related violence, nor is there an indication that the
2002 shooting at the crowd outside the predecessor of the Zone was related to
gangs, drugs, or alcohol.

       [18] Here, the shooting was intentional—just like a gang- or drug-related
shooting would be—and it occurred in a high crime area with a history and rep-
utation for violence. The risk of violent assault that those circumstances created
included an intentional shooting that may leave incidental, unintended victims.
Gang members and drug dealers do not always aim with precision. In that sense,
the type of shooting in this case is not too different from the "mass murder" sce-
nario that the dissent implies.

       [19] The Court of Appeals put the matter well when it said:

       "Whether the circumstances of a particular assault—such as the shoot-
       er's motive or mental state, the intended victim, or the weapon used—are
       'details,' or instead serve to make the crime qualitatively different from other
       foreseeable harms, will vary from case to case. Based on the facts alleged
       in plaintiff's complaint, a reasonable juror could conclude that this type of
       assault—a gunman firing at patrons waiting in line to enter [t]he Zone—fell
       within the category of risks that the Zone defendants should have antici-
       pated, regardless of the shooter's particular motive, mental state, intended
       targets, or weapon used."

*Piazza*, 271 Or App at 511-12.

to distinguish between "the manner of harm" and the "end result." 360 Or at __ (Balmer, C. J., dissenting). According to the dissent, our characterization of the harm risked as "violent assault," is an "end result," upon which we focus to a fault, while "ignoring the manner in which the harm occurred." *Id.* at __. In making that argument, the dissent relies on several decisions of this court, but that reliance is misplaced.[20]

*Hefty v. Comprehensive Care Corporation*, 307 Or 247, 766 P2d 1026 (1988), illustrates the type of "extreme case" that is beyond the general rule of foreseeable harm. In that case, K, a teenager, was voluntary admitted to the defendant's Adolescent Care Unit for the treatment of alcoholism. *Id.* at 250. Six days after she was admitted, she

---

[20] The dissent also relies on cases from other jurisdictions. As the dissent notes, 360 Or at __ (Balmer, C. J., dissenting), the Seventh Circuit in *Shadday v. Omni Hotels Management Corp.*, 477 F3d 511, 517 (7th Cir 2007), limited the defendant's liability for criminal conduct in that case under District of Columbia law to circumstances "when it has some reason to think such crime likely." Similarly, in *Commonwealth v. Peterson*, 286 Va 349, 749 SE2d 307 (2013), relied on by the dissent, 360 Or at __ n 2 (Balmer, C. J., dissenting), the court followed the Virginia rule providing, unlike Oregon law, that

"where the special relationship was that of business owner/invitee or landlord/tenant, we have imposed a duty to warn of third party criminal acts only where there was an *imminent probability* of injury from a third party criminal act."

*Peterson*, 286 Va at 357, 749 SE2d at 312 (internal quotation marks and citation omitted; emphasis added). Because this court has never required that an injury be probable, let alone imminently probable, in order to satisfy the foreseeability requirement, those authorities are simply inapplicable here. Moreover, although it is unnecessary to pursue the matter in detail, as two commentators have noted, there is much room to question the reasoning of *Shadday*, in particular:

"The idea that a hotel owes no duty to its guests to take steps to protect them from other guests is quite untenable. Imagine that a hotel installed low-grade electronic locks that enabled guests easily to use their own room keys to open other guest's rooms. If a guest were to take advantage of this inadequate security system to break into the room of another guest and attack the other, the victim's claim that the hotel failed in a basic responsibility to provide security would be quite compelling. This would be a failure to provide the security that a guest reasonably expects from a hotel and that a hotel implicitly promises to its guests. The duty Shadday was owed was a duty to take ordinary care against her being attacked on the premises. Parsing that risk into the risk of attack by intruders versus guests is arbitrary and unmotivated."

John C. P. Goldberg & Benjamin C. Zipursky, Civil Recourse Defended: A Reply to Posner Calabresi, Rustad, Chamallas, and Robinette, 88 Ind LJ 569, 588-89 (2013).

left the facility against the medical advice of the unit. *Id.* Neither K nor the hospital notified her parents that she had left. *Id.* While riding as a passenger on a friend's motorcycle, she sustained severe head injuries in an accident with an automobile. *Id.* at 251. Neither drugs nor alcohol was a factor in the collision. *Id.*

Importantly, the court said:

> "The risk to be foreseen was not that [K] would ride on the back of a motorcycle and be injured in a collision with an automobile. \*\*\* The risk to be foreseen was more general— it encompassed those generalized incidents and injuries created by discharging [K], an impaired minor addicted to alcohol, without notice to parents or police, without the permission of her doctor, without providing alternative care, and with the knowledge that [K] could not care for herself."

*Id.* at 252 (citation omitted).

As pertinent here, *Hefty* stands for the proposition that the risk of harm to be foreseen must be described more generally than the dissent would describe it. Instead of describing the risk of harm to be foreseen narrowly as the risk that the daughter "would ride on of a motorcycle and be injured in a collision with an automobile," the court carefully tied the risk to be foreseen to the more general risk encompassed by the "generalized incidents and injuries created by" the defendant's unreasonable conduct. *Id.* Ultimately, the court held that, because neither alcohol nor drugs had been involved in the accident—that is, because the connection between the defendant's negligent conduct and the harm that the plaintiff suffered was too attenuated—no reasonable trier of fact could find that K's injuries fell within the scope of the foreseeable risk posed by the discharge. *Id.* at 252-53.

The dissent also relies on *Oregon Steel Mills*. In that case, there was no causal relationship between the defendant's conduct (negligently preparing an accounting report) and the "force" that inflicted harm on the plaintiffs (a declining stock market); the stock market did not take notice of the defendant's negligence and use the opportunity to decline. *Oregon Steel Mills*, 336 Or at 345. The two events

occurred in a temporal relationship to each other that were completely coincidental.

This court in *Oregon Steel Mills* took pains to describe the problem for the plaintiff as lack of foreseeability, not causation in fact. *See id.* at 344. However, the court focused on the lack of a causal nexus between the defendants' conduct and the market forces that led to the price decline that harmed the plaintiff, when it ultimately concluded that "the intervening action of market forces on the price of plaintiff's stock was the 'harm-producing force,' and defendant's actions did not *'cause'* the decline in the stock price so as to support liability for that decline." *Id.* at 345 (emphasis added). That is another way of saying, as in *Buchler*, that the defendant's conduct merely facilitated the harm ultimately suffered by the plaintiff. *See Buchler*, 316 Or at 511-12 ("[M]ere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it.").

But, here, the relationship between defendants' conduct and the harm inflicted on Delgado is qualitatively different from the relationships in *Hefty* and *Oregon Steel Mills* that this court deemed to be too attenuated.[21] Here, in contrast to the circumstances in those cases, as alleged in plaintiff's complaint, the assailant's access to Delgado and the other teens outside the Zone was directly connected to the Zone defendants' asserted negligence in failing to provide adequate security against violent assault for patrons lined up on the sidewalk. To the extent that the dissent's "manner of harm/end result" argument more narrowly describes the pertinent risks of harm as "gang-, drug-, and alcohol-related violence," 360 Or at __ (Balmer, C. J., dissenting), it is bound up in the dissent's conception of the appropriate level of generality with which to describe the presenting risk of harm, a conception that we do not share.

Finally, the dissent argues that we have not adequately explained our conclusion that plaintiff's complaint

---

[21] As we later explained, *Oregon Steel Mills* "turned on the specific facts before the court." *Bailey*, 343 Or at 289-90.

sufficiently alleged foreseeability. Although the dissent may not be satisfied, the analysis cannot be reduced to the application of Euclidean-like postulates. That is because, as previously explained, foreseeability in the pertinent sense ultimately is a blended factual and normative inquiry. Because reasonable foreseeability invokes a community's application of its own values, whether a particular outcome of conduct is foreseeable is most appropriately decided by the community's closest proxy in our civil justice system, that is, by a jury. Exceptions exist only for harm resulting from "the concatenation of highly unusual circumstances." *Stewart*, 255 Or at 609. *Fazzolari* reiterated that standard: "[T]he issue ordinarily can be left to the jury," except for conduct "at the outer margins." 303 Or at 12.[22] In an earlier case, Justice O'Connell put it this way:

> "In any case where there might be reasonable difference of opinion as to the foreseeability of a particular risk, the reasonableness of the defendant's conduct with respect to it, or the normal character of an intervening cause, the question is for the jury, subject of course to suitable instructions from the court as to the legal conclusion to be drawn as the issue is determined either way."

*Dewey*, 233 Or at 536 (O'Connell, J., concurring) (quoting William L. Prosser, *Handbook of the Law of Torts* 282 (2d ed 1955)).

Precisely because it is driven by community values, judges have no upper hand over juries in the inquiry, except to act as gatekeepers at the outer margins.[23] With that

---

[22] The dissent misunderstands our reasoning in asserting that, "[i]n effect, the majority concludes that an assailant's methods and motivations are irrelevant to the foreseeability analysis." 360 Or at __ (Balmer, C. J., dissenting). To the contrary, those factors are relevant to the analysis, but we do not share the dissent's view that they are so conclusive in this case as to preclude a jury determination that the harm that befell Delgado was reasonably foreseeable to defendants.

[23] In a thoughtful discussion of the underpinnings of the allocation of responsibility between judge and jury in foreseeability determinations, one commentator has said:

> "The genius of the jury is that it brings to each case multiple perspectives, both shared and diverse experiences, and (with the exception of the occasional attorney-juror) a legal tabula rasa. To put it simply—especially when considering a question like foreseeability that is part-analysis,

limited role in view, what we have here is not a suburban mall in daylight hours or some other workaday public place where people ordinarily go about their routines with only a remote consciousness of the risk of a violent attack. Instead, as alleged in plaintiff's complaint, the scene of this shooting was an inadequately secured sidewalk queue where teenagers were waiting to enter a nightclub, late in the evening, in a high-crime urban neighborhood that, based on publicized past experience, posed a risk of violent harm to persons present. The harm that befell Delgado, although thankfully uncommon, was within the range of risks of harms that a reasonable factfinder could find was reasonably foreseeable in the circumstances alleged in plaintiff's complaint.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

### BALMER, C. J.

A reader of the majority opinion would be forgiven for thinking that the death of plaintiff's decedent was the tragic result of the kind of gang-, drug-, or alcohol-related violence that plaintiff alleges to be common in the neighborhood around the Zone nightclub. But that is not what happened here, and plaintiff does not allege otherwise. Instead, decedent was shot during an attempted mass murder by a violent schizophrenic assailant, Ayala, who opened fire simply because he was intent on killing teenagers. Plaintiff does not allege that Ayala was a gang member, a drug dealer, or a club-goer or had any other foreseeable connection to the Zone or the Zone's neighborhood.

The majority opinion, nevertheless, concludes that plaintiff's allegations of gang-, drug-, or alcohol-related violence could establish that the shooting incident in this case was foreseeable because both the alleged neighborhood violence and the shooting at issue here are types of "violent

---

part-community experience, and part-gestalt—perhaps twelve heads are better than one."

W. Jonathan Cardi, *Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts*, 58 Vand L Rev 739, 800 (2005) (footnote omitted).

assaults." 360 Or at ___. But the majority fails to explain why that similarity matters. Contrary to the majority's analysis, it does not follow as a matter of law or as a matter of logic that, simply because *some* types of violent assault are foreseeable, therefore *all* types of violent assault are foreseeable. I would limit the types of foreseeable risks in this case to those that plaintiff has alleged to be present at the time and place of the shooting—namely, gang-, drug-, and alcohol-related violence, which might include some shooting incidents but would exclude the shooting incident in this case. Defining the foreseeable risks any more broadly than that, as the majority does, goes beyond the risks that the complaint alleges. For those reasons, I dissent.

The principal issue on review is whether plaintiff has alleged facts that would allow a reasonable jury to conclude that the shooting incident underlying this negligence case was a type of foreseeable risk created by defendants' conduct. According to plaintiff, the Zone nightclub had a history of violence, because a shooting happened there in 2002—seven years before the shooting incident here—and because underage nightclubs are inherently dangerous, due to the high proportion of young male patrons, high noise levels, crowding, and "competitive situations." Further, plaintiff alleges that "assaults" occur regularly in the area around the Zone because of gangs, drug dealing, and over-consumption of alcohol. Those facts, plaintiff alleges, were known, or should have been known, to defendants. As a result, plaintiff contends that a risk of violent assault was foreseeable. Plaintiff concludes, therefore, that the Rotary defendants were negligent for leaving the group of teenagers, including decedent, at the Zone, and that the Zone defendants were negligent for asking patrons to form a line outside the club and failing to provide more and better security.

Plaintiff's allegations are unquestionably thin and bear little relationship to the unprovoked shooting in this case. That is particularly true with regard to the Rotary defendants. Plaintiff alleges only that the Rotary defendants "knew, or in the exercise of reasonable care, should have known, about the dangers of leaving plaintiff's decedent in the Zone nightclub on the date and time in question." Although "the fact that the defendant was aware of a

particular risk" is usually a factual allegation rather than a legal conclusion, *Moore v. Willis*, 307 Or 254, 259, 767 P2d 62 (1988), it is not clear to me that plaintiff's allegation of "danger" is an allegation of a *particular risk*. And although plaintiff alleges that "instances of violence that occurred nationally at underage nightclubs and locally in the area around the Zone nightclub were all publicized in local and/ or national media," plaintiff does not allege that the Rotary defendants were aware of those "local and/or national" news reports, nor any reason why the Rotary defendants—or their alleged agents, decedent's host family in White Salmon, Washington—should have been aware of those reports. Reports of violence are commonplace. Local and national media are so saturated with crime stories that an ordinary person cannot be expected to take note of all violent acts wherever they might travel and account for them in assessing the risks of engaging in daily life. Foresight of that kind would demand "a paranoid view of the universe," and that is not what the legal standard of foreseeability requires. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 21, 734 P2d 1326 (1987).

Nevertheless, I do not believe that that issue needs to be resolved because, even assuming that the Rotary defendants had the same knowledge as the Zone defendants, those allegations are insufficient to establish that the shooting incident underlying this case was foreseeable. We generally make that determination by comparing the harm that a plaintiff suffered to the general types of risks foreseeably created by a defendant's conduct. *Id.* at 17 (describing the standards of foreseeability). The trial court ruled that plaintiff's allegations, even if true, could not establish that the shooting incident was foreseeable and therefore dismissed plaintiff's second amended complaint under ORCP 21 A(8) for failing to state ultimate facts supporting her negligence claim against both the Zone defendants and the Rotary defendants.

When reviewing a trial court's ruling dismissing a plaintiff's complaint under ORCP 21 A(8), we assume, like the trial court, that the facts alleged in the complaint are true, and we draw all reasonable inferences in the plaintiff's favor. *Bailey v. Lewis Farm, Inc.*, 343 Or 276, 278, 171 P3d

336 (2007). The majority agrees that, when assessing the sufficiency of a plaintiff's allegations to state a claim, it is the court's role to "'determine whether upon the facts alleged *** no reasonable factfinder could decide one or more elements of liability.'" *Chapman v. Mayfield*, 358 Or 196, 205, 361 P3d 566 (2015) (quoting *Fazzolari*, 303 Or at 17).

Foreseeability is central to establishing the elements of a negligence claim. A defendant may be subject to liability for negligence only if the defendant's conduct "unreasonably created a foreseeable risk *** of the kind of harm that befell the plaintiff." *Fazzolari*, 303 Or at 17. Therefore, a plaintiff fails to state a negligence claim if the plaintiff fails to allege facts that would allow a reasonable jury to find that the plaintiff was harmed by a foreseeable risk created by the defendant's unreasonable conduct. *Solberg v. Johnson*, 306 Or 484, 490-91, 760 P2d 867 (1988) (stating that the elements of a negligence claim include "that defendant's conduct caused a foreseeable risk of harm, *** that defendant's conduct was unreasonable in light of the risk, [and] *** that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent").

As a result, defining the scope of foreseeable risks has important implications for tort law generally and particularly when liability will be imposed for negligent conduct. A risk is foreseeable if a reasonable person would have "reasonably expected the injury to occur." *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609, 469 P2d 783 (1970). If the scope of foreseeable risks is described more broadly, then that necessarily means that an actor should expect his or her conduct to lead to more or greater harms. A more broadly defined risk makes it easier to establish both that a defendant's conduct is unreasonable (because the probability and severity of foreseeable harms are factors in determining reasonableness) and that a plaintiff's harm falls within the risks created by the defendant's unreasonable conduct (because the risk encompasses more harms). The opposite is true when the foreseeable risks are defined narrowly.

Although foreseeability is a component of both the reasonableness determination and the harm-within-the-risk

determination, defendants do not challenge the sufficiency of plaintiff's allegations to establish that defendants' conduct was unreasonable. Thus, for the sake of reviewing the trial court's dismissal order, we assume that the Rotary defendants should not have taken the teenagers to the Zone. And we assume that the Zone defendants should not have required patrons to form a line and should have provided more and better security.

Instead of challenging the reasonable-conduct element of plaintiff's negligence claims, defendants challenge plaintiff's pleading of the element requiring that decedent's harm was within the foreseeable risks created or increased by defendants' conduct. *See, e.g.*, *Chapman*, 358 Or at 206 (considering "whether plaintiffs' injuries were within the type of potential harms that made defendant's conduct unreasonable"; affirming summary judgment for defendant); *Bailey*, 343 Or at 281 (reversing dismissal where "[t]he type of harm that plaintiff suffered fell squarely within the scope of the risk that defendant's negligence created").[1] That element identifies the legal limit of liability for negligently caused harms—that is, the point at which we will not hold a defendant liable for harms, even if the defendant acted unreasonably and even if the defendant's conduct was a but-for (or substantial-factor) cause of the injury. *See, e.g.*, *Stewart*, 255 Or at 607 (noting defendant's negligence and causation but attempting to "draw[] the line at which the defendant's liability ends").

As it relates to that element, overly broad and overly narrow categories of risk distort the limits of liability:

> "It has been observed that 'if we use a very generalized description of the type of harm that was foreseeable and of the type of harm that occurred, an answer that the result was within the risk is inevitable.' And on the other hand, '(i)f we use a detailed, mechanism-of-harm description of the result and the risks, the answer will be negative.'"

---

[1] *See Restatement (Third) of Torts: Phys. & Emot. Harm* § 29 (2010) ("An actor is not liable for harm different from the harms whose risks made the actor's conduct tortious."); *id*. § 30 ("An actor is not liable for harm when the tortious aspect of the actor's conduct was of a type that does not generally increase the risk of that harm.").

*Id.* at 610 (quoting Robert E. Keeton, *Legal Cause in the Law of Torts*, 51 (1963)) (footnotes omitted); *see also Chapman*, 358 Or at 208 (same) (citing *Stewart*, 255 Or at 610). Risks should not be defined so narrowly as to require the defendant to foresee the precise sequence of events, as they unfolded, that lead to the particular plaintiff's particular injury. *See Fazzolari*, 303 Or at 21 (so stating). Instead, we focus on generalized risks of harm. *Id.* at 13 (citing *Stewart*, 255 Or at 610-11). My disagreement with the majority, therefore, is not whether courts should use "generalized" descriptions of risk; our cases correctly require us to do so. My disagreement, rather, is over how broadly to define the generalized risks that we use in this case. As *Stewart* itself recognized, a generalized risk of harm may be defined in terms that are too general. *Stewart,* 255 Or at 610. Because liability is intended to track community standards for blameworthiness, risks must be characterized with sufficient particularity to distinguish between conduct that is blameworthy and conduct that is not. *Id.* at 608-09 (so stating). Risks that are defined too broadly—where a finding of foreseeability is "'inevitable,'" *id.* at 610 (quotation omitted)—cannot serve as a meaningful limit on the scope of liability. *See Fazzolari*, 303 Or at 21 (so stating).

There is no single standard for determining the appropriate level of generality for defining risks. Last year, in *Chapman*, this court emphasized the importance of appropriately identifying how generally to define risks. 358 Or at 208. To do so, "this court's practice in cases that address foreseeability as a limit on liability" has been to "[d]raw[ ] on the plaintiff's theory of liability" and to "view[ ] the defendant's conduct through the lens of the particular factual circumstances of the case—with emphasis on what the defendant knew or should have known about the risk of harm." *Id.*

For example, in *Stewart*, the court addressed the appropriate level of generality for defining the foreseeable risks created by negligent welding operations. In that case, there was no question that the defendant's unreasonable conduct started a fire that spread to a neighboring warehouse. *Stewart*, 255 Or at 605. While attempting to prevent further fire damage on the roof of that warehouse, the plaintiff fell

through a covered skylight, hit the floor, and suffered various injuries. *Id.* Thus, there was also no question that defendant's conduct was a factual cause of the plaintiff's injury. But the court noted that establishing that the defendant's unreasonable conduct caused the plaintiff's injury is not sufficient to establish liability, because a defendant is not liable for all injuries caused by his or her unreasonable conduct. *Id.* at 606. Instead, a defendant is subject to liability only for injuries that can be "anticipated." *Id.* at 609.

The court concluded that the plaintiff's injury could be anticipated because a reasonable person would know that firefighters "might be injured as a result of a variety of possible circumstances—by being burned, by falling off a ladder, by falling off a roof, by falling through a burned portion of the roof, or by other similar risks normally associated with fighting fires." *Id.* at 610. Although falling through a covered skylight might not immediately come to mind as a potential harm, it was foreseeable because it was within the types of risks that a reasonable person would reasonably expect a firefighter to encounter. *Id.*

The plaintiff's theory and supporting evidence were related to firefighting, so the risk of harm was defined in reference to firefighting. Based on that theory and that evidence, it would have been inappropriate, for example, to define the risk as being "falling through covered skylights." That risk would have been too narrow because it would have required the plaintiff to establish that defendant had specific knowledge that the skylight was covered. That risk would have also been too broad because it would encompass risks outside the plaintiff's theory of liability and the evidence offered. Hypothetically, bystanders might have gone to the roof of a warehouse upwind from the fire simply to watch the activity. If a bystander on that warehouse fell through a covered skylight, the defendant's negligent conduct still might have been a *factual cause* of the resulting injuries. But the *foreseeability* of that injury could not have been established through evidence of the risks encountered by firefighters.

In this case, plaintiff attempts to establish that the shooting incident was foreseeable based on defendants'

knowledge of prior criminal acts at or around the Zone. As noted above, we assume that defendants' conduct was unreasonable, and, therefore, we assume that they had knowledge of prior criminal acts at or around the Zone that would cause them to be aware of some continuing risk of further criminal acts. The question is whether the shooting incident in this case was among the criminal acts that a reasonable person would foresee based on those prior criminal acts allegedly known to defendants.

Answering that question requires comparing those prior criminal acts to the shooting incident in this case. The majority identifies a number of factors relevant to that comparison—namely, the degree of similarity, frequency, recency, and geographic proximity between the plaintiff's harm and the prior criminal acts alleged by the plaintiff. 360 Or at ___. And, as the majority notes, similarity may be based on the nature of the criminal act itself, or it may be based on other considerations, such as the circumstances of the offense or the specific types of victims.

Thus, a generalized risk does not need to be defined so broadly as to capture all of the prior criminal acts that a plaintiff has alleged. Instead, the risk is based only on those prior criminal acts that indicate a continuing risk of injury at the time and place of a defendant's allegedly negligent conduct and a plaintiff's resulting harm. In other words, the foreseeability of a plaintiff's injury cannot be based on prior criminal acts that are too dissimilar, are too remote in time or place, or otherwise fail to indicate a continuing risk at the relevant time and place.[2] Prior criminal acts that are dissimilar to the criminal act that caused the plaintiff's injury might have signaled a continuing risk of some *other* type of harm, but not the risk of harm that the plaintiff suffered. And prior criminal acts that are too remote in time

---

[2] In certain circumstances, prior criminal acts may no longer indicate a continuing risk, even if the prior criminal acts are close in time and place to the plaintiff's injury. In *Commonwealth v. Peterson*, 286 Va 349, 749 SE2d 307 (2013), for example, the Virginia Supreme Court held that knowledge that two university students were shot and killed on campus did not establish the foreseeability of a mass shooting by the same assailant hours later, which lead to the deaths of 32 people. At the time the mass shooting began, defendants reasonably believed that the earlier shooting was a domestic incident and that "the shooter had fled the area and posed no danger to others." *Id.* at 359.

and place might have signaled a continuing risk of harm at some *other* time or some *other* place, but not at the time and place of the plaintiff's injury. What counts as dissimilar or too remote will depend on the plaintiff's theory of liability and factual allegations.

For example, in *Fazzolari*, a female student was sexually assaulted on school grounds. 303 Or at 3. In assessing the foreseeability of the sexual assault, the court noted that there was evidence of a prior sexual assault on another female at the same school only 15 days earlier. *Id*. at 21. Although the court in *Fazzolari* did not expressly apply the factors that the majority now identifies, that single prior criminal act established recency, geographic proximity, and similarity of the criminal act sufficient to allow the issue to go to the jury. In considering evidence of "various other kinds of attacks," the court noted that "evidence of foreseeability will differ depending on whether the risk of injury is claimed to be specific to a school, or schools generally, or a neighborhood, or a class of potential victims such as women or particular ethnic groups." *Id*.

Similarly, we start by assessing decedent's injury in this case and then compare it to the prior criminal acts allegedly known by defendants. According to plaintiff, the shooting incident in this case occurred when Ayala approached a group of teenagers waiting in line at night outside the Zone and opened fire with a semiautomatic handgun with the intent to kill them. As pleaded, Ayala was a paranoid schizophrenic who was motivated to commit the shooting by an irrational and hostile fixation with teenagers.[3]

The prior criminal acts alleged by plaintiff to be known by defendants relate to the Zone itself and to the neighborhood around the Zone. As it relates to the Zone, plaintiff alleges that underage nightclubs are inherently dangerous because many patrons are young males in "competitive

---

[3] Defendants ask this court to take judicial notice of the fact that Ayala shot a total of nine people, killing two—decedent and one other victim—and that Ayala then fatally shot himself at the scene. It would have been more appropriate for defendants to raise that issue in the first instance with the trial court. Regardless, that issue is beyond the scope of this case because, for the reasons described in the text, this court should affirm the trial court's dismissal order even if we do not take judicial notice of the facts that defendants offered.

situations" and clubs are often noisy and crowded. But prior incidents of teenage fights are plainly insufficient to create a reasonable expectation of an unprovoked shooting. Further, plaintiff relies on a shooting in 2002 that injured three people outside the location later occupied by the Zone. Although that shooting is a similar criminal act in some ways, it happened seven years before the shooting in this case—nothing like the 15 days that separated the crimes in *Fazzolari*. Because of that lack of recency, we cannot simply assume that the causes of the 2002 shooting persisted and continued to pose a risk of another shooting there in 2009. And plaintiff alleges no additional facts that could establish that the 2002 shooting created a reasonable expectation of a shooting seven years later.

As it relates to the area around the Zone, plaintiff alleges that violent assaults occur regularly because of gangs, drug dealing, and over-consumption of alcohol. To substantiate that, plaintiff provides crime statistics from an expansively drawn area, covering the entire Downtown and Old Town/Chinatown neighborhoods. Plaintiff, however, makes no allegations addressing the extent to which those crimes actually happened near the Zone, affected Zone patrons, or otherwise resembled the unprovoked shooting in this case. In other words, in an attempt to establish recency and frequency, plaintiff has stretched the bounds of similarity and geographic proximity.

Nevertheless, the majority insists that a reasonable jury would be allowed to conclude that defendants should have foreseen a risk of "violent assault." 360 Or at ___. The majority does not further limit its characterization of that foreseeable risk, which, therefore, covers *all types* of violent assault. But the expansiveness of that risk proves that it is untenably broad. A risk of "violent assault" would cover nearly all types of violence, including the shooting incident in this case, but also including sexual assaults, armed robberies, bombings, and even acts of terrorism—each of which is a type of violence that would not have been foreseeable based on plaintiff's allegations. If plaintiff had pleaded that the shooting incident occurred in a war zone, then we might expect a reasonable person to anticipate the wide range of harms that fall within the category of "violent assaults."

But plaintiff's allegations are far more limited than that. Consequently, the foreseeable risk that may be established by plaintiff's allegations requires some limitation.

That limitation separates the types of violence that could have been reasonably expected from the types of violence that could not have been reasonably expected. As explained above, many of plaintiff's allegations are too remote to indicate a continuing risk at the time and place of the shooting.[4] Focusing only on plaintiff's allegations that indicated a continuing risk of injury at the time and place of the shooting, plaintiff's allegations could support, at most, a conclusion that defendants should have foreseen *some types* of violent assaults—namely, those types of violent assaults that plaintiff alleged to be common in the neighborhood at the time of the shooting: gang-, drug-, and alcohol-related violence. Plaintiff's allegations of prior gang-, drug-, and alcohol-related crimes indicated a foreseeable risk of harm at the time of the shooting because, as alleged by plaintiff, gang-, drug-, and alcohol-related activity continued to persist in the area around the Zone at that time.

The foreseeable risk in this case is defined by the type of criminal—*i.e.*, whether the criminals whose activities posed the allegedly foreseeable risks of harm are connected to gang-, drug-, or alcohol-related activities—rather than the type of crime, because plaintiff's allegations provide no other grounds for defining the risk. There will likely be many cases where the type of criminal will carry less weight in the foreseeability analysis, such as cases where the prior criminal conduct is more similar, recent, frequent, and geographically proximate than those alleged by plaintiff. In those cases, it may be reasonable to infer that the cause of the prior crimes persisted at the time and place of the later crime. But, given the lack of similarity, recency, frequency, and geographic proximity, that inference is not reasonable based on plaintiff's factual allegations. *See Delgado v. Souders*, 334 Or 122, 135, 46 P3d 729 (2002) (whether an inference is reasonable is a question of law). Further, plaintiff makes no allegation that the Zone specifically attracted

_____

[4] The majority appropriately declines to give weight to all of plaintiff's allegations. 360 Or ___; *id.* at ___ n 13.

people wanting to commit unprovoked shootings or people directing violence at teenage victims. Although the majority notes that Ayala targeted the Zone because he sought out teenage victims, 360 Or at ___, ___, plaintiff does not allege that Ayala's intention to shoot teenage victims was known to defendants prior to the shooting incident and, therefore, cannot provide grounds for establishing foreseeability.

Once the risk posed by the alleged prior criminal acts is properly defined as gang-, drug-, and alcohol-related violence, it is apparent that decedent's harm was not within the foreseeable risk: Plaintiff makes no allegation that Ayala was involved in gang-, drug-, or alcohol-related activities or had any connection to gang members, drug dealers, or club goers in the neighborhood. Further, eliminating the risk of gang-, drug-, and alcohol-related activity in the area around the Zone would have had no effect on the likelihood of the shooting incident in this case, plainly establishing that the risks are distinct. To be sure, gang-, drug-, and alcohol-related violence are themselves broadly defined and generalized risks of harm. But to define the foreseeable risks more broadly than that would improperly divorce the risk of harm from plaintiff's theory of liability and from the factual circumstances alleged by plaintiff to be known to defendants.

In reaching its conclusion that all violent assaults in the geographic area that plaintiff identified were foreseeable, the majority fails to consider the similarity, recency, frequency, and geographic proximity of the prior criminal acts. Instead, the majority's analysis appears to first go off track by reading more into our prior cases than those cases can support. According to the majority, "This court's previous decisions generally prescribe a relatively broad level of generality in assessing the reasonable foreseeability of criminal conduct as a limit on liability." 360 Or at ___ (citing *Fazzolari*, 303 Or at 21).

The problem is that, as noted above, when this court most recently addressed the process for defining the foreseeable risks, that process did not "prescribe a relatively broad level of generality," as the majority now asserts. 360 Or at ___. Instead, after reviewing the same case law

that the majority reviews in this case, we concluded that the process for appropriately identifying how generally to define the risks requires critically assessing the connection between plaintiff's theory of liability and the facts alleged to be within defendants' knowledge. *Chapman*, 358 Or at 208. As a result, our prior cases in fact do not exhibit a preference for either a broad or narrow level of generality. Rather, the appropriate level of generality turns on plaintiff's theory of liability and the facts alleged to be within defendants' knowledge. Whether a different theory of liability and different facts alleged in a different case supported a broad level of generality is immaterial.

In any event, I do not share the majority's reading of *Fazzolari* as prescribing that *all types* of assaults be treated as one category of foreseeable risks. That decision never defines an appropriate level of generality. Although *Fazzolari* states that "a school's responsibility for students' safety against assault is not limited to the risk of rape," 303 Or at 21, that statement goes to assessing the reasonableness of the school's precautions. The more foreseeable assaults that might be prevented through a particular safety precaution, the more likely that it was unreasonable for the school not to take that precaution. As the court noted earlier in its opinion in *Fazzolari*, "[I]t is important that all foreseeable risks of harm to other classes of persons be considered in evaluating the reasonableness or unreasonableness of defendant's conduct." *Id.* at 14. But simply because *all foreseeable assaults* should be considered when determining whether conduct is reasonable does not mean that *all assaults are foreseeable*.

The majority attempts to justify the broad level of generality by explaining that location-based risks are uniquely suited to broadly defined foreseeable risks. The majority insists that it is appropriate to use a broad level of generality

"where, as here, the risk of harm at a particular location is at issue. *See*, *e.g.*, *Uihlein*, 282 Or at 641 ('[T]here must be something to alert the storekeeper to the likelihood of harm of some kind from a criminal agency.'). That only makes sense. When a business owner is on notice that—in

the absence of reasonable precautions—assaultive conduct can be anticipated where people are waiting in line to enter its premises, it rings hollow to suggest that a specific crime pattern triggers the owner's duty to protect patrons only with regard to those specific crimes (such as gang-related homicide) that have occurred."

360 Or at ___. But there is no question that a business owner must take reasonable precautions to protect invitees from assaultive conduct reasonably expected to occur. The question is whether the harm that decedent suffered was among those types of assaultive conduct that defendants should have reasonably expected to occur.

In answering that question, the majority refuses to distinguish between criminal conduct based on the characteristics of the shooter:

"To the extent that [defendants'] challenge focuses on the precise sequence of events that occurred in this case, defendants invite a taxing level of comparison that this court consistently has rejected. As noted, contrary to defendant's focus, foreseeability has reference to 'the generalized risk of the types of incidents and injuries that occurred rather than the predictability of the actual sequence of events.' *See Fazzolari*, 303 Or at 13 (discussing *Stewart*)."

360 Or at ___. In effect, the majority concludes that an assailant's methods and motivations are irrelevant to the foreseeability analysis. But, as described above, plaintiff's allegations make them relevant here because only gang-, drug-, and alcohol-related crimes could have given rise to a reasonable expectation of injury at the time and place of the shooting.

From the majority's perspective, that does not matter because gang-, drug-, and alcohol-related violence entailed a risk of a violent assault and a violent assault happened. But, although we do not require plaintiffs to allege or adduce facts establishing that the precise sequence of events was foreseeable, we also do not focus only on the end result—*e.g.*, a violent assault—while ignoring the manner in which the harm occurred. A foreseeable risk cannot be defined without connecting the end result to the reasons that the risk was foreseeable in the first place. Therefore, "identical injuries,

if they occur in different ways or at different times, may be treated differently." *Restatement (Third) of Torts: Phys. & Emot. Harm* § 29 comment d (2010).[5]

That principle is well-established in our case law. For example, in *Hefty v. Comprehensive Care Corporation*, 307 Or 247, 766 P2d 1026 (1988), the plaintiffs were a minor who had been a patient at the defendant's alcohol treatment center as well as her parents. *Id.* at 250. The defendant prematurely discharged the minor, who was still suffering from alcoholism, without notifying her parents or doctor or otherwise providing alternative arrangements for her care. *Id.* The day after the discharge, the minor was involved, as a passenger, in a traffic accident that did not involve drugs or alcohol. *Id.* at 251.

Plaintiffs sued the defendant for negligently discharging the minor. The court resolved the case on foreseeability, asking whether the plaintiff's "injuries fell within the scope of the 'generalized risk of the types of incidents and injuries' created when defendant discharged [the plaintiff]." *Id.* The court appropriately identified two generalized types of foreseeable risks created by the defendant's conduct: (1) that the minor would "resume abusing alcohol and drugs"; and (2) that the minor "would engage in activities consistent with her impaired judgment and inability to control her behavior." *Id.* at 252.

Notably, the court did not define the risk by the end result—a traffic accident—even though it was at least plausible that either of those risks could lead to a traffic accident. If, for example, the minor had been driving and was under the influence of alcohol, then the accident might have

---

[5] In *Legal Cause in the Law of Torts*, which this court relied on in *Stewart*, 255 Or at 610, Keeton expressly warned against ignoring the manner in which the harm occurred:

"[E]xtreme freakishness of the sequence of events that produces a final state of affairs that might have been expected to come about in some other way commends itself as a relevant consideration and stands against a practice of description of the harm in a way that wholly disregards the mechanism of injury. The choice of description involves a degree of orientation toward type of harm on the one hand or toward mechanism of harm on the other hand, with neither point of view wholly rejected."

*Legal Cause in the Law of Torts* at 52.

fallen within the scope of the risk that she would resume abusing alcohol. But the fact that defendant's conduct created a risk that could lead to a traffic accident and the fact that a traffic accident occurred was insufficient, because the traffic accident that was risked was a different type of traffic accident than the one that occurred. The issue was not whether the defendant's unreasonable conduct contributed to the traffic accident—that would merely establish factual causation. The issue was whether the reasons that made the defendant's conduct unreasonable were related to the traffic accident that occurred. The court denied liability as a matter of law because the plaintiffs adduced no evidence establishing that the minor's substance abuse or impaired judgment were related to the traffic accident. The court held, "'In an extreme case a court can decide that no reasonable factfinder could find the risk foreseeable.' This is an 'extreme case.'" *Id*. at 253 (quoting *Donaca v. Curry Co.*, 303 Or 30, 38, 734 P2d 1339 (1987)).

Similarly, in *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 83 P3d 322 (2004), we considered the liability of an accountant who negligently misstated a steel company's earnings, delaying the company's stock offering, through which the company intended to raise capital. *Id*. at 333. By the time the company's stock was offered, the market for steel company stocks had declined. As a result, the company's stock sold for less than it would have if it had not been delayed by the accountant's negligence, and the company was unable to raise as much capital as it would have otherwise. *Id*.

As in *Hefty*, the issue in *Oregon Steel Mills* was not factual causation; instead, the issue was foreseeability. *Id*. at 344 ("There is sufficient evidence of factual causation \* \* \* . Rather, the critical issue is whether plaintiff's market losses were a reasonably foreseeable result of defendant's wrongful conduct.").[6] Again, the court did not define the risk as the end result—stock-price reduction and resulting

---

[6] *See, e.g.*, *Solberg*, 306 Or at 490 (distinguishing between whether "defendant's conduct caused a foreseeable risk of harm," which is an issue of foreseeability, and whether "the conduct was a cause of plaintiff's harm," which is an issue of factual causation).

decrease in the capital raised—even though an accountant's negligence entailed such a risk. For example, negligently misstating earnings might understate a company's prior earnings, making the company's stock less desirable and impairing the ability to raise capital. Then, there would be a connection between the accountant's negligence and the stock-price reduction that impaired the company's ability to raise capital.

But the fact that the accountant created a risk of a lower stock price and the fact that a lower stock price occurred was not sufficient, because the stock-price reduction that was risked was a different type of stock-price reduction than the one that occurred. Instead, liability required establishing that the lower stock price occurred in the manner that was reasonably anticipated. This court denied liability as a matter of law because the company's stock price was not lowered by the accountant's negligence; it was lowered by market fluctuations that affected the entire steel industry and had nothing to do with the accountant's negligence. *Id.* ("[P]laintiff seeks damages based solely on a decline in the price of plaintiff's stock during the delay that defendant caused in getting the offering to market, yet plaintiff admits that the price decline affected all steel stocks and was unrelated to defendant's misconduct.").[7]

Other courts have likewise distinguished between the manner of the harm and the end result under facts similar to this case. For example, *Shadday v. Omni Hotels Mgmt. Corp.*, 477 F3d 511 (7th Cir 2007), involved a negligence claim against a hotel for failing to prevent the sexual assault of the plaintiff, who was a hotel guest. *Id.* at 511. The sexual assault was committed by another hotel guest. *Id.* In

---

[7] The majority attempts to distinguish *Hefty* and *Oregon Steel Mills* by asserting that, "in contrast to the circumstances in those cases, as alleged in plaintiff's complaint, the assailant's access to Delgado and the other teens outside The Zone was directly connected to defendants' asserted negligence." 360 Or at ___. But foreseeability does not turn on whether the connection between the defendant's conduct and the plaintiff's injury is direct rather than indirect—both of which may establish liability. Instead, foreseeability turns on whether the connection should have been reasonably expected. *Stewart*, 255 Or at 609. In any event, it is unclear why the connection is more direct in this case than in *Hefty* and *Oregon Steel Mills*. In all three cases, the harm-inducing force is extrinsic to the defendant's conduct.

denying liability as a matter of law, Judge Posner explained that, based on the evidence adduced, the risk of crime was from intruders and not from hotel staff or guests. *Id.* at 516. Although "the precautions against guest-on-guest crime are not dramatically different from the precautions against intruder crime" such that the hotel's failure to take those precautions might have been a but-for cause of the guest's injury, that fact did not establish liability. *Id.* at 517. Instead, regardless of the risk of sexual assault presented by intruders, "[t]he hotel becomes liable for guest-on-guest crime only when it has some reason to think such crime likely," and the plaintiff presented no such evidence in that case. *Id.*

It may be worth asking why the manner of harm matters when a defendant's conduct is unreasonable and the end result is the same, regardless of the manner in which it occurs. Judge Posner addressed that question in *Shadday*: "[T]he puzzle of the line of cases that [require the harm to be within the foreseeable risk] is why the defendant, having been negligent, should get off scot-free just because the harm that would have been averted had he been careful was not foreseeable." *Id.* at 518. He notes that, without requiring the harm to be within the risk, "negligence liability is potentially too encompassing." *Id.*

Our case law reflects those concerns as well. Liability is intended to turn on fault, and fault is predicated on blameworthiness. *Stewart*, 255 Or at 608. "[T]he community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen." *Id.* at 609. Defining the risk of harm in this case by the end result—all violent assaults—would allow defendants to be subject to liability for those violent assaults that could be reasonably anticipated (gang-, drug-, and alcohol-related violence) but also allows defendants to be subject to liability for those violent assaults that could not have been reasonably anticipated (such as the shooting incident in this case).

Focusing on the end result, while ignoring the manner in which that end result was reached, is like crediting a broken clock because it happens to be right twice a day. The correctness of a broken clock turns on the coincidence that it

was viewed at the same time of day that it previously stopped working. But in that case, whether the clock is correct has nothing to do with whether the clock is functioning properly. Likewise, whether the end result was foreseeable has nothing to do with a defendant's blameworthiness unless the end result occurred in a foreseeable manner. Focusing only on the end result allows liability to turn on coincidence rather than blameworthiness.

Finally, the majority opinion emphasizes the notion that questions of foreseeability should be decided by the jury. 360 Or at ___. Although it is true that foreseeability is a fact issue, simply identifying an issue as factual does not entitle a party to a jury trial or even to proceed to summary judgment. Rather, it depends on the relevant facts alleged in the complaint or established by the summary judgment record. Only when those facts are reasonably disputed does the issue go to the jury. The jury's role, of course, properly can be an expansive one, particularly in deciding fact-intensive issues like foreseeability. But even as to foreseeability, the court retains its role as gatekeeper, allowing cases to proceed to the jury only if reasonable minds could reach different conclusions on whether the facts alleged or adduced could prove a plaintiff's case. *Stewart*, 255 Or at 607.[8]

The majority defines the foreseeable risk in this case broadly as "violent assaults" and leaves it to the jury to decide whether the foreseeable risk should be defined more narrowly. But the majority fails to explain how a reasonable jury could define the risk that broadly based on the narrow facts alleged. How broadly or narrowly a reasonable jury may define the generalized risks foreseeably created by defendants' conduct is a question of law appropriately and necessarily resolved by the courts. *See Fazzolari*, 303 Or at 17 (defining the role of courts).

Negligence liability is intended to reflect community standards of fairness and proportionality. Our system operates on the "assumption that judges as well as juries

---

[8] In *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), this court rejected a common misreading of *Fazzolari* as standing for the proposition that "all negligence claims based on general foreseeability of a plaintiff's harm would reach the jury." *Id.* at 511 n 8.

know something about the kind of conduct that is deemed acceptable or not acceptable in the community and that, at least at the higher and lower ends of the continuum of that standard, the court can say that the conduct does or does not meet the standard." *Stewart*, 255 Or at 607-08. When liability is clearly inappropriate, as it is in this case, "we are charged with the duty of withdrawing the issue from the jury." *Id.* at 609. Although allowing too few cases to proceed to trial intrudes on the role of the jury, allowing too many cases to proceed to trial abdicates the role of the courts. Consequently, I would affirm the trial court's dismissal and, therefore, dissent.

Landau, J., joins in this dissenting opinion.